JULIUS TENENBAUM, Plaintiff-Appellee, *v.* THE CITY OF CHICAGO, Defendant-Appellant and Counterplaintiff-Appellee—(O'NEIL CONSTRUCTION COMPANY, Defendant-Appellant and Counterdefendant-Appellant.)

(No. 55216;

First District (4th Division)—May 9, 1973.

EGAN, J., specially concurring.

ADESKO, J., dissenting.

Richard G. French, of Howard & French, of Chicago, for appellant City of Chicago.

Richard C. Valentine and Thomas W. Dempsey, of Lord, Bissell & Brook, of Chicago, for appellant O'Neil Construction Company.

John G. Phillips, of Chicago, (Dom J. Rizzi, of counsel,) for appellee Julius Tenenbaum.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Julius Tenenbaum (plaintiff) brought action for personal injuries against the City of Chicago (City) and O'Neil Construction Company (O'Neil). At the time of the occurrence, plaintiff had been employed by Link Belt Company (Link Belt). The City filed a third-party action against Link Belt and also a counterclaim against O'Neil seeking indemnity from both. Link Belt assumed defense of the City and the third-party action against it was dismissed.

After a jury trial, a verdict was returned against the City and O'Neil in the amount of $150,000. The court directed a verdict in favor of the City on its counterclaim against O'Neil and entered judgment against O'Neil for the full amount of the recovery. The City and O'Neil both appeal.

Plaintiff's original complaint against the City and O'Neil, filed August 5, 1964, contained one count and sought recovery on the theory of negligence. On January 15, 1970, with leave of court, plaintiff filed an amended complaint of two counts against both defendants. One count alleged violations of the Structural Work Act of Illinois. (Ill. Rev. Stat. 1971, ch. 48, par. 60—69). The other alleged violations of a City ordinance which incorporated the terms of the statute. City Code of Chicago, ch. 75, sec. 1, etc.

The points raised here by O'Neil fall into two categories. O'Neil urges that the judgment be reversed because the Structural Work Act does not apply as a matter of law; there was no proof that O'Neil violated this Act and there was no evidence that O'Neil had charge of the work as required by the statute. The second category of contentions urges reversal of the judgment and remandment of the cause for a new trial because of trial errors: in the instructions to the jury combined with permitting plaintiff's counsel to read a City ordinance to the jury; refusal of the trial court to permit proper attempt at impeachment of plaintiff by O'Neil and prejudicial final argument by plaintiff's counsel. O'Neil also urges that the judgment in favor of the City on its counterclaim for indemnity should be reversed as a matter of law.

In its separate brief, counsel for the City urge reversal of the judgment as a matter of law because the Structural Work Act does not apply. The City also joins O'Neil in urging that the trial court erred in permitting commingling of the Structural Work Act of Illinois with ordinances of the City and provisions of the contract between the parties and in permitting plaintiff's counsel to read ordinances to the jury. The City also urges, contrary to the position taken by O'Neil, that the court properly entered judgment in favor of the City and against O'Neil for indemnity based upon the contract between them.

Plaintiff maintains that the Structural Work Act is applicable here;

the defense of contributory negligence is not applicable to alleged violations of the City ordinance by O'Neil; the jury properly found that O'Neil was in charge of the work and that O'Neil wilfully violated the Structural Work Act. As regards trial errors, plaintiff responds that the court did not err in permitting cross-examination of a witness for O'Neil concerning health and safety rules of the State of Illinois; if such error did exist, it was waived by failure of O'Neil to object; it was not error to permit plaintiff's counsel to read provisions of the City ordinance and also of a manual of Accident Prevention which were incorporated in the construction contract; there was no error with respect to attempted impeachment; no error in the instructions or closing argument; and, finally, no error which in any way affected the outcome of the trial.

The evidence here shows the following material facts. The City contracted with O'Neil to erect an underground water treatment plant as an addition to existing facilities. The work consisted primarily of a concrete structure. O'Neil was one of several general contractors which entered into written agreements with the City. O'Neil also engaged a number of subcontractors. Plaintiff was employed as a labor foreman by Link Belt which was also a general contractor. O'Neil was the first contractor to commence work on the concrete structure. Link Belt was to install certain chemical mixing and scraping equipment which required performance of some concrete work in erecting bases for this purpose.

Plaintiff was injured at a portion of the work referred to as Basin No. 4. This basin consisted of three levels. The roof was at ground level and contained a penthouse resting thereon. Seventeen feet below the ground level was an intermediate floor. Seventeen to 18 feet below this intermediate level was the concrete floor of the basement. Included in the structure was a so-called baffle area designed to check or regulate the flow of water. Above this area there were openings in the concrete floors at each of the levels. On the intermediate level, there was an opening slightly more than nine feet in width. This opening extended through all floors and had been used for hoisting equipment and materials between the lower and upper levels.

On June 8, 1964, plaintiff sent two of his men, also employed by Link Belt, into the area to remove debris and wood which may have been left on the intermediate floor. This area was then checked by the City and plaintiff was told that further work was necessary there. Plaintiff entered the area himself to determine if his personnel had properly performed the work. Part of the area to the west consisted of a so-called maze through which the water would flow when the finished work was

in operation. Plaintiff walked on the intermediate floor in an easterly direction through a portion of this maze. As he progressed and went around one wall, he found that there was no light. He testified that he tried to turn on temporary light bulbs which did not operate. He thereupon continued, with the use of a flashlight.

As he came toward the baffle chamber on the intermediate level, something hit his arm. As he had progressed toward this point, there had been various types of wood and other material against the wall. He dropped his flashlight and it went out. He started searching on the floor feeling with his hands for the light. As plaintiff searched in the dark, he tripped. As he stumbled, he felt the edge of a ladder with rungs. He testified that in trying to regain his balance, the ladder shifted with him and he could feel the rungs as it slid along a little bit with him. He then fell into space. Plaintiff had fallen through the aperture and to the concrete floor of the basement some 17 or 18 feet below. The nature and severity of plaintiff's injuries are not disputed.

There are various conflicts in the evidence. There is evidence that the hole through which plaintiff fell had been used for hoisting of materials and equipment in connection with the work. There is evidence that, at the time of the occurrence, this hole had been closed at the ground level, which constituted the roof of the project. Also, it appears that this portion of the hole had remained open during the preceding week and was closed shortly before the mishap occurred. There was no barricade in front of the hole at the time of the occurrence. There is also testimony that O'Neil had completed its work in this area prior to this occurrence; although there is evidence that O'Neil had been working on the top level of the structure at the east end, above where the accident occurred, and also at the west end. The evidence shows that O'Neil, as well as Link Belt, had used the hole in question for hoisting purposes. O'Neil produced evidence that it had removed its equipment from the intermediate area and had poured a concrete roof at grade level (the roof) over the entire baffle area some three months before the occurrence.

As regards the lighting on the day in question, the area contained no provision for permanent lighting as it was designed to be under water when the facility was completed. O'Neil had established temporary lighting in the area but there is evidence that it had removed this equipment prior to the occurrence. Link Belt had, however, provided temporary lighting by means of an electric cord and bulbs. Plaintiff testified that the area was dark and that these electric bulbs did not operate.

As regards the ladder, there is evidence that a stepladder had been used at the job to permit access between the intermediate floor and the basement level. Link Belt personnel, as well as O'Neil employees, had used the ladder at the time of the accident and prior thereto. O'Neil offered proof that it had no ladders in the area at the time and that none of its personnel were actually using the area when the mishap occurred. However, there is testimony that the ladder used for access between the basement level and the intermediate area above was some 17 or 18 or even 20 feet long. There is also evidence that Link Belt used only shorter ladders about six to eight feet in length in its work in the area and there is conflicting evidence that there had been a ladder belonging to Link Belt between the levels.

■■ The first issue, raised by O'Neil and the City, is applicability of the Structural Work Act. This revolves primarily about the language of the statute which applies to "All scaffolds, hoists, cranes, stays, ladders, supports or other mechanical contrivances * * * for the use in the erection * * * of any * * * structure * * *" and which requires them to be "* * * so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same * * *." (Ill. Rev. Stat. 1971, ch. 48, par. 60.) This court is strongly committed "* * * to provide a liberal construction of the Structural Work Act to attain the purpose of providing workmen in extrahazardous operations with a safe place to work * * *." (Navlyt v. Kalinich, 125 Ill.App.2d 290, 293, 260 N.E.2d 855, aff'd 53 Ill.2d 137, 290 N.E.2d 219.) The requirement of a liberal construction of this salutary and remedial legislation has been the law of Illinois from the early decision in Schultz v. Henry Ericsson Co., 264 Ill. 156, 106 N.E. 236, to the present day.

■■ In the case at bar, the opening through which plaintiff fell had been used during construction for hoisting equipment and materials from one level to another. It has been held that a portion of the permanent edifice being created by the construction, which is used as a stay or support for the work, is within the purview of the Act. In Louis v. Barenfanger, 39 Ill.2d 445, 236 N.E.2d 724, the court held that a complaint which alleged that plaintiff fell from the place on the permanent structure where he was working stated a cause of action. In effect, plaintiff's evidence in this case shows that he was using the concrete floor of the intermediate level, which had been previously used as a basis for hoisting activities, as a platform upon which he was performing his duties within the purview of his employment. (See

*Spiezio v. Commonwealth Edison Co.*, 91 Ill.App.2d 392, 407, 235 N.E.2d 323.) Under this analysis, we find no problem in concluding that the concrete floor from which plaintiff fell was a scaffold or support within the requirements of the Act.

■■ Plaintiff testified that he tripped upon a ladder and fell. There is evidence from which the trier of fact could have found that this ladder had been provided and used as a method of climbing up to and down from the intermediate level from which plaintiff fell. The only alternative method of going up or down between the intermediate level and the basement floor, a vertical distance of 17 or 18 feet, was a stairway which was more than 350 feet away from where plaintiff fell. In view of this testimony, plaintiff was protected by the Structural Work Act and this ladder should have been placed and operated so as to give proper and adequate protection to the life and limb of any person passing under or by it.

This conclusion is amply supported by the authorities. In *Karris v. Goldman*, 118 Ill.App.2d 85, 254 N.E.2d 605, plaintiff was working upon a plank scaffold as a bricklayer's helper. A mortar plate was placed upon the scaffold. In lifting mortar, plaintiff stepped upon the plate. It tipped and caused him to fall. A verdict and judgment for plaintiff were affirmed by this court upon the theory that (118 Ill.App.2d 85 at 90):

> "It was a proper jury question to resolve whether the makeup of the platform and its dimension were sufficient and safe enough to accommodate plaintiff and the requisite equipment, and to provide sufficient space upon which plaintiff was to perform his task of shoveling. The jury could find, for instance, that the use of the motar plate, which was 3 ft. square and weighed between 20 and 30 pounds with a portion thereof overhanging the outermost part of the scaffold, caused the scaffold to become insufficient, unsafe and dangerous."

The case at bar is even stronger than *Karris*. There, the presence of the mortar plate upon the scaffold was held to cause it "to become insufficient, unsafe and dangerous." In the case at bar, not only could the jury find that the ladder accomplished the same result and made the floor (actually used as a scaffold) unsafe and dangerous but also the ladder in and of itself is a protected instrumentality directly within the purview of the Act.

The court in *Karris* cited and relied upon *Schultz v. Ericsson*, 264 Ill. 156, 106 N.E. 236. There, a runway used for wheelbarrows was cluttered with piles of bricks. Plaintiff was injured when his wheelbarrow became entangled with one proceeding in the opposite direction. The Supreme

Court affirmed a judgment for plaintiff upon the theory that the presence of the bricks made the scaffold "* * * insufficient, unsafe and dangerous" (264 Ill. 156, at 165).

■■ Quite analogously, in the case at bar, it was the duty of the trier of fact to decide whether, under all of the circumstances here, the very presence and placement of the ladder created an unsafe and dangerous condition in violation of the Act. It is difficult to determine from the record if the ladder was lying upon the concrete floor or was in place between the intermediate level and the subbasement, protruding above the floor of the former. The darkness may have prevented plaintiff from knowing this. In any event, the situation was properly submitted to the jury for their determination.

We have examined all of the many authorities cited by O'Neil and by the City. Perhaps the closest case on the facts is *McGinnis v. Cosmopolitan National Bank & Trust Co.*, 114 Ill.App.2d 113, 252 N.E.2d 56. We find that case inapplicable here. Plaintiff was employed by a tenant in a building which was being remodeled. She heard her name called and the sound seemed to emanate from a hole made in the floor for construction purposes. She walked over to the opening, leaned over and fell through to the basement. This court held that she was not within the purview of the Structural Work Act. The court properly pointed out that the dumbwaiter or hoist which was to be installed in the aperture did not yet exist. (See 114 Ill.App.2d 113, at 116.) Furthermore, the plaintiff there was not engaged in construction work but was employed by a tenant in an entirely different occupation not within the purview of the Act.

The City cites at length and relies upon *Thon v. Johnson*, 30 Ill.App.2d 317, 174 N.E.2d 400. There, some workmen built a form for the purpose of installing a concrete slab in a garage floor. Plaintiff, an electrician, attempted to use this form to enable him to reach a switchbox. The form collapsed and he was injured. This court held that plaintiff's injuries were not compensable under the Structural Work Act. This cited case has been differentiated on the ground "* * * that something which is not intended for use as a scaffold does not become a scaffold merely because of the intention of the party so using it." (See *Crafton v. Lester B. Knight & Associates*, 114 Ill.App.2d 52, at 56, 252 N.E.2d 383.) See also *Karris v. Goldman*, 118 Ill.App.2d 85, at 88, 254 N.E.2d 605.

We note also that *Thon* was cited by the dissent in *Louis v. Barenfanger*, 39 Ill.2d 445, at 456, 236 N.E.2d 724, but only as support of the proposition that the appellate courts "* * * have been uniform in their interpretation of the Structural Work Act to exclude permanent and integral parts of the structure." Since *Louis* was decided by the

Supreme Court in 1968, the court has not, to our knowledge, relinquished or modified the position taken by the majority opinion.

■■ The remaining authorities cited by O'Neil and the City are those usually cited and relied upon in proceedings of this character. An additional analysis of each is not required. Upon consideration of the entire record, we have concluded that there was sufficient evidence to bring plaintiff within the operation of the applicable statute. O'Neil contends that the "real cause of the mishap was the dropping of the flashlight by plaintiff or the failure of the temporary lighting to work." Certainly, however, the presence of the ladder was a contributing and effective cause of plaintiff's injuries. Whether or not the presence of this instrumentality made the concrete floor, upon which plaintiff was performing his duty, unsafe or dangerous was an issue of fact for determination by the jury. (*Walden v. Schillmoeller & Krofl Co.*, 111 Ill.App.2d 95, 99-100, 248 N.E.2d 547.) It was proper for the trial court to deny the motion of defendants for directed verdict at the close of plaintiff's case and to submit the cause to the jury.

■■ In addition to the above cogent reasons, there is another quite independent but equally potent theory which brings this case within the purview of the Structural Work Act. Count 2 of plaintiff's complaint as amended alleged failure of those in charge of the work to supply safe barricades for the opening through which plaintiff fell. The Act requires that where " * * * elevating machines or hoisting apparatus are used within a building in the course of construction for the purpose of lifting materials to be used in such construction, the contractors or owners shall cause the shafts or openings in each floor to be enclosed or fenced in on all sides by substantial barrier or railing at least eight feet in height." (Ill. Rev. Stat. 1971, ch. 48, par. 66.) The evidence here shows that the aperture through which plaintiff fell was not fenced or barricaded at the time. There is also evidence that at one time the hole had been protected by some type of barricade which was then removed. The evidence is conflicting as to precisely when the hoisting of materials through the hole was completed. The evidence is, however, clear that the hoisting process had been discontinued prior to the day of the mishap. Section 66 of the statute, which must, of course, be liberally construed in plaintiff's favor, requires the barricades "[i]f elevating machines or hoisting apparatus are used * * *." The statute does not say that barricades are required only when hoisting apparatus is actually in use. The law does not use the present progressive tense are "being used" so as to require the barriers only while hoisting was in progress. The statute fails to specify precisely when the person in charge of the work should remove the barriers. Under these circumstances, questions of

fact existed as to whether or not the removal of the barricades and their absence when plaintiff fell constituted a violation of the Act. See *Claffy v. Chicago Dock & Canal Co.*, 249 Ill. 210, 94 N.E. 551.

■■ Furthermore, even if O'Neil had actually suspended or completed its hoisting activities as well as its other work in the particular area in question some days before the occurrence, this fact alone would not necessarily enable it to avoid its liability under the Structural Work Act. Those in charge of the work may not evade their legal liability in a situation of this type by mere inaction. (See *Pantaleo v. Gamm*, 106 Ill. App.2d 116, 125-126, 245 N.E.2d 618.) The presence of these conflicting factual issues made submission of the cause to the jury by the trial court not only proper but imperative.

■■ O'Neil next urges that there is no proof of a wilful violation of the Act. As stated in O'Neil's brief, plaintiff alleged that O'Neil violated the Act by improperly placing the ladder; failing to provide adequate lighting and failure to provide a barricade over the opening used for hoisting materials. The issue was whether these violations were wilful within the purview of the statute. (Ill. Rev. Stat. 1971, ch. 48, par. 69.) Our courts have consistently held that the word "wilfully," as used in this context, is quite different from the familiar phrase "wilful and wanton." Actually, "wilful" is more synonymous with "knowing." The essence of the Structural Work Act is not limited to the concept of knowing or intentional misconduct or even to reckless disregard. Liability is imposed where the existence of dangerous conditions could have been discovered by reasonable care. *Jones v. S. S. and E. Corp.*, 112 Ill. App.2d 79, 94-95, 250 N.E.2d 829, and cases therein cited.

■■ Whether or not the unsafe and dangerous condition which caused plaintiff's injuries should have been discovered by defendants by the exercise of reasonable care was a question of fact for the jury. The trial court did not err in submitting this issue to the jury.

■■ O'Neil next urges that there was no evidence that it had charge of the work within the technical meaning of the language of the Act. In the frequently cited case of *Larson v. Commonwealth Edison Co.*, 33 Ill.2d 316, 211 N.E.2d 247, the Supreme Court pointed out that the statutory words "having charge of" are words of common usage and understanding which need not be defined or explained to the jury other than by use of the words themselves. The court held that these words do not limit duty and liability to persons who have control or supervision of the work; and, further, that exercise of supervision and control, or retention of these rights, are not in themselves essential elements of being in charge.

■■ In the case at bar, the contract between O'Neil and the City

provided for erection of the basic structure. All other prime or general contractors were concerned primarily with the installation of equipment and machinery and facilities for the use thereof within the structure. There was a long and complicated contract between the City and O'Neil setting forth the rights of the parties with reference to performance of the work by O'Neil. It has been correctly pointed out by this court that "* * * the duties of a general contractor to the owner can be determinative of the issue of who was in charge of the jobsite." (*O'Leary v. Siegel*, 120 Ill.App.2d 12, 19, 256 N.E.2d 127.) The contract provided that all of O'Neil's subcontractors and their employees were to be considered employees of O'Neil. O'Neil was to determine methods and procedures in connection with the work. The contract specifically provided that the work was to "* * * be under the charge and care of * * *" O'Neil until acceptance by the City. The evidence is clear and undisputed that such acceptance had not yet occurred when plaintiff was injured. It was the duty of O'Neil, under the contract, to keep the jobsite free from material and debris and to remove items which would constitute a safety hazard. All equipment was to be removed by O'Neil upon completion of the work.

Furthermore, O'Neil had more employees on the project than any other contractor. It was the prime contractor for erection of the basic structure. Actually an O'Neil engineer testified that O'Neil was "in charge" of the area in question (Basin No. 4) when plaintiff was injured. There is evidence that O'Neil had not fully completed its work in the area at that time. In addition, as pointed out by counsel for the City, if the jury believed plaintiff's testimony, it could reasonably conclude that O'Neil created an unsafe condition by leaving the ladder in or near the unbarricaded hole.

■■ In view of all of these circumstances, the determination as to whether O'Neil was in charge of the work was an issue of fact for resolution by the jury. (*Kobus v. Formfit Co.*, 35 Ill.2d 533, 537-538, 221 N.E.2d 633; *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 22 Ill.2d 305, 323, 175 N.E.2d 785.) Whether or not a person is in charge of the work has been well described as "the ultimate factual question" in cases arising under the Structural Work Act. (See *Jones v. S. S. & E. Corp.*, 112 Ill.App.2d 79, at 92-93, 250 N.E.2d 829, with particular reference to the citation from *Larson v. Commonwealth Edison Co.*, 33 Ill.2d 316, 211 N.E.2d 247.) It was proper for the trial court to submit to the jury the issue as to whether O'Neil was or was not in charge of the work. The determination by the jury that O'Neil was in charge of the work was not contrary to the manifest weight of the evidence.

We turn next to consideration of the alleged trial errors urged by

O'Neil and the City. O'Neil urges the existence of reversible error because of refusal of the trial court to permit attempted impeachment of plaintiff by use of his prior inconsistent statements. Plaintiff testified on direct examination that he did not have a clear memory of the occurrence when his deposition for discovery was taken in 1965. He also testified that in 1970, several weeks before trial, his recollection was refreshed by an examination of hospital records. He further testified that he tripped, tried to regain his balance and felt the edge of the ladder with rungs. The ladder slid along a little bit with him. He then stated, "And I remember falling into space and that is all I remember." On cross-examination, he stated that he tripped over a ladder and, as he tried to regain his balance, the ladder shifted with him. He felt the rungs and side rail of the ladder.

It appears from the discovery deposition of plaintiff, as read to the trial court out of the presence of the jury, that plaintiff testified then that he bent over and scraped his feet along, feeling for the light. He kept walking and feeling and he fell. He also added, "That is all I remember." On the deposition, he further stated that he walked three or four steps after he dropped his flashlight and before he fell. He then testified directly that during those three or four steps, he did not feel any sort of an obstruction in front of him. The trial court sustained the objection to attempted impeachment by use of this deposition.

It further appeared that plaintiff had refreshed his recollection from a statement in his history taken at the hospital. This was to the effect that plaintiff "* * * fell down from sladder [sic] losing consciousness for a few hours * * *." When the trial court refused cross-examination of plaintiff upon the deposition, counsel for O'Neil requested that he be permitted to cross-examine from the hospital history and made an offer of proof thereof. The trial court refused the right to cross-examine on the history and refused the offer of its admission in evidence.

 As we have already shown, the presence of this ladder was a central and most important aspect of plaintiff's case. It requires no citation of authority to establish that any litigant should have the right to test the credibility of an opposing occurrence witness by use of his prior inconsistent statements relative to material matters. (See *Sommese v. Maling Bros., Inc.*, 36 Ill.2d 263, at 268-269, 222 N.E.2d 468. See also *Dembinski v. F. & T. Corp.*, 124 Ill.App.2d 112, at 117-119, 260 N.E.2d 359.) It is our considered opinion that this ruling by the trial court was erroneous and that it effectively denied O'Neil a fair opportunity of attempting to impeach plaintiff, the sole occurrence witness, by his previous inconsistent statements. Fairly read, the testimony given by plaintiff on his deposition was directly contradictory to the testimony on

trial. This situation cannot be changed by the fact that plaintiff testified on direct examination that his recollection had been refreshed by the hospital record. This information regarding plaintiff's prior testimony was indispensable to the jury in performing their duty of evaluating plaintiff's credibility as regards his testimony upon a most crucial fact.

As regards the hospital history, the authorities establish that plaintiff had the right to examine the memorandum to refresh his recollection and then to testify from his independent recollection as thus refreshed. (*Adamaitis v. Hesser*, 56 Ill.App.2d 349, 354-355, 206 N.E.2d 311.) Plaintiff having done so, it follows necessarily that O'Neil had the right to inspect the memorandum and to cross-examine regarding its use by plaintiff in the recollection process. "This is clearly the settled law in this state." (*Justice v. Pennsylvania R.R. Co.*, 41 Ill.App.2d 352, 355, 191 N.E.2d 72.) The jury was entitled to know and to evaluate the source of the revival of plaintiff's recollection. On the other hand, the hospital record itself was not competent evidence. There was no proper foundation laid as to the circumstances of preparation of the record nor was the person who had made this record produced in court. See *Healy v. City of Chicago*, 109 Ill.App.2d 6, at 12-13, 248 N.E.2d 679.

It follows that the ruling of the trial court rejecting the offer of the hospital record in evidence was correct. The rulings of the trial court refusing cross-examination on the deposition and on the source of plaintiff's refreshed recollection were erroneous.

O'Neil and the City both direct our attention next to the instructions. The case was tried before the second edition of IPI was available. Plaintiff's Instruction No. 4 will be considered first. This instruction delineated the issues in the case for the jury. O'Neil objects to this instruction on the ground that it omitted use of the word "wilful" in describing violations of the Act. This criticism is not well taken.

The court also gave the jury Plaintiff's Instruction No. 5 which carefully defined "wilful" in accordance with established authority as above discussed without use of that word. This procedure is approved by IPI 2d in which pattern Instruction 180.04 is a model for the issues instruction and 180.14 is a model for enlightenment of the jury on the definition of violation of the Act. In both cases, the instructions given by the trial court, Plaintiff's Instructions Nos. 4 and 5, parallel with extreme accuracy the requirements now expressed in IPI 2d. The introduction to these instructions explains the need for elimination of the word "wilful." See IPI 2d at page 466 and the comment to pattern Instruction 180.01 at pages 467 and 468. In our opinion, these instructions as given were completely proper and in accordance with law.

O'Neil also takes exception to Court's Instruction No. 1, relat-

ing to the burden of proof and also to Plaintiff's Instruction No. 9, which gave the jury the provisions of the Structural Work Act. We find that Court's Instruction No. 1 on the burden of proof closely parallels IPI 2d Instruction 180.09 as modified to fit the circumstances in the case at bar. Plaintiff's Instruction No. 9 is very close to the new IPI 2d Instruction 180.01 except for the fact that the instruction as given by the court followed more closely the language of the statute. This instruction is also criticized by O'Neil on the ground that it failed to use the term "wilful violation." We find no error in the giving of these instructions and use of the same by the trial court is approved.

■■ We do find reversible error in connection with Plaintiff's Instruction No. 3. This matter requires a background statement. It will be remembered that this cause had its origin and existed for almost six years as a negligence action. The original complaint contained various charges of negligence by defendants. An allegation was included that defendants had negligently failed to comply with an ordinance of the City referred to as ch. 75, sec. 1 of the City of Chicago Code. This ordinance required all persons in control or supervision of any building in the course of erection to comply with the Structural Work Act of Illinois. The original complaint also charged that defendants negligently failed to comply with ch. 76, sec. 4 of the City Code requiring openings in floors to be properly protected and the erection of barricades in openings on intermediate floors. We note, parenthetically, that this original complaint alleged that plaintiff was "* * * engaged in the proper performance of his duties" but contained no allegation that plaintiff was in the exercise of due care for his own safety.

After the case had been assigned for trial, on January 15, 1970, with leave of court, plaintiff filed an amended complaint consisting of two additional counts. Count 2 alleged wilful violation of the Structural Work Act in three particulars. Count 3 alleged the existence of the City of Chicago Ordinance ch. 76, above described, purporting to incorporate the Structural Work Act and also providing that provisions of the American Standard Safety Code for Building Construction promulgated by the American Standard Association shall be considered as accepted engineering practice regarding safeguards during construction. Count 3 also alleged various violations of other portions of the ordinance.

On February 3, 1970, after verdict, plaintiff filed amendments to the complaint as previously amended. Count 2 was amended to add allegations regarding placement of the ladder by defendants; failure of defendants to discover improper placement of the ladder near the unbarricaded hole; failure of defendants to require adequate lighting in

the area and failure to supply safe barricades for the opening. Count 3 was amended to allege violations of chapter 75, sections 1 and 1(c) and chapter 76, section 4 of the Municipal Code of Chicago in that the opening in the floor should have been covered or protected; openings through which hoists operated should have been properly enclosed and guards should have been provided at every point of danger at all sides of the open areaway exceeding three feet in depth.

Defendant O'Neil filed a motion to dismiss the amended complaint. The court heard this motion before trial and denied it. The cause then proceeded to trial not on the theory of negligence as originally advanced by plaintiff, but upon a theory of wilful violation of the Structural Work Act and also of the City ordinance. This ordinance in effect embodies the state law and attempts to expand it by reference to safety code standards of the American Standard Association, together with other ordinances of the City pertaining to precautions during construction.

Plaintiff followed these theories all throughout the trial of the cause and the court overruled objections made by defendants. In examining an O'Neil engineer, counsel for plaintiff brought before the jury various provisions of the manual of Accident Prevention for Contractors as well as various health and safety rules of the State of Illinois. Plaintiff took the position, approved by the trial court, that compliance with these various safety codes was required by the construction contract. The court then also permitted counsel for plaintiff to read to the jury various portions of the City ordinances as above described.

At the close of the case, the court gave Plaintiff's Instruction No. 3. This purported to be an instruction on the issues based upon IPI 2d 60.01 pertaining to violation of a statute or ordinance. This instruction told the jury that a City ordinance provided that all persons having control or supervision of a building in the course of construction should comply with the Structural Work Act of Illinois. It stated that the ordinance provided that the American Standard Association rules should be considered as accepted engineering practice; and, further, it described three provisions of the City ordinances requiring openings in floors to be protected; openings through which hoists operated to be enclosed on all sides and guards to be required at all sides of every open areaway exceeding three feet in depth. The instruction then stated plaintiff's claim that he was injured as a proximate result of the violation of the ordinance, the denial of defendants that they were guilty of the violations and their additional denial that plaintiff was injured or damaged to the extent claimed. In this regard, the instruction was patterned after the usual and familiar instruction on the issues. (IPI 2d 20.00 and following.) However, the instruction as given contained no reference to

negligence and no reference to denial by defendants that plaintiff was in the exercise of ordinary care as well as no reference to any claim by plaintiff that he was in the exercise of ordinary care. The instruction did not follow IPI 2d 60.01 on violation of a statute or ordinance in that it did not tell the jury merely that they could consider the fact of violation · with all the other facts and circumstances in evidence in determining the existence of negligence.

We must first determine the legal effect of the City ordinance purporting to adopt the Structural Work Act and in effect to expand its provisions. The statute applies to persons having charge of construction. The ordinance applies to all persons having charge of construction. The ordinance applies to all persons having control or supervision of construction. In this regard, the ordinance does not conform to the statute. The ordinance also provides that provisions of the code of the American Standard Association should be considered as accepted engineering practice. In this regard, the ordinance purports to exceed the bounds of the statute and to impose absolute liability upon any person who violates the code of the American Standard Association during construction.

■■■■ It is the law of Illinois that when the sovereign state has entered into a specific area and has provided regulations by statute governing the activities in question, no ordinance of any municipal ·corporation inconsistent with the statute can have legal force and effect. No city ordinance in Illinois can "* * * add to, subtract from, or affect the provisions of a statute * * * and if it is in conflict with a statute it is invalid * * *." (*Traders Development Corp. v. Zoning Board*, 20 Ill.App.2d 383, 392, 156 N.E.2d 274.) The wisdom of this principle is readily apparent. Lawyers accustomed to orderly thinking and classification could hardly conceive of a situation in which every municipality could eliminate or expand statutes to modify or enlarge legal causes of action in any of the myriad affairs of life regulated by any statute. The ordinance depended upon by plaintiff is, in our opinion, a nullity as regards the rights of the parties in the case at bar. It has no legal effect of any kind insofar as it purports to restrict or expand the operation of the Structural Work Act within the boundaries of Chicago.

Plaintiff proceeded before the jury, however, as though the ordinance gave additional grounds for action under the Structural Work Act far greater than those given by the Act itself. In our opinion, this was prejudicial error which requires reversal of the judgments herein. One of the damaging results of this proceeding was to permit plaintiff in effect to establish a cause of action for violation of ordinances on the theory of absolute liability without requiring plaintiff to prove his own

freedom from contributory negligence and the negligence of defendants. It is true, as plaintiff urges here, that the health and safety regulations, which plaintiff's counsel read to the jury, were incorporated into the construction contract. These matters would have been material and, therefore, properly read to the jury if the issues of negligence and contributory negligence were pertinent to the case. Under the circumstances shown here, the reading of these matters was error. They had no bearing upon the issues in the case and served only to confuse the jury.

In *Jones v. S. S. & E. Corp.*, 112 Ill.App.2d 79, 250 N.E.2d 829, this court reversed a judgment for plaintiff because of an instruction which described to the jury the provisions of the Health and Safety Act of Illinois. This instruction merely explained certain provisions of the Act and also told the jury that they could consider a violation of this Act, together with all other facts and circumstances in evidence, in determining whether there had been a violation of the Structural Work Act. This court held that this was erroneous since the statute in question covered only the relationship between employer and employee and plaintiff was not an employee of defendant. Similarly, in the case at bar, violations of an ordinance should not be considered in determining whether the Structural Work Act was violated. Further, in *Jones*, the jury was merely told that violations of the other statute were to be considered by them with all the other facts and circumstances in evidence in determining whether the Structural Work Act had been violated. The criticized instruction in the case at bar (Plaintiff's Instruction No. 3) merely stated the claims of the parties. This was combined with a burden of proof instruction based upon the Structural Work Act. The result was the elimination of all other issues in the case, including contributory negligence and negligence, except the one issue of violation of the Structural Work Act, as well as violation of the provisions of the ordinance.

The recent decision of this court in *Avery v. Moews Seed Corn Co.*, 131 Ill.App.2d 842, 268 N.E.2d 561, aptly illustrates this point. There, conversely to the situation at bar, plaintiff claimed that he was injured by defendant's negligent violation of rules adopted under the Illinois Health & Safety Act. The court permitted plaintiff's attorney to read these rules to the jury. Defendant objected to this upon the authority of *Jones*. This court rejected defendant's contention. The court pointed out that in a Structural Work Case, such as *Jones*, it was improper to read rules of this type to the jury. But, in a case based upon negligence, it was permissible to bring the rules before the jury under proper instructions by the court in attempting to establish a standard of care as a basis for proof of negligence.

■■■■ As also pointed out by defendants, this error was accentuated

by the fact that, over objection, the court permitted counsel for plaintiff to read the City ordinances to the jury. Reading of legal matters, whether statutes, ordinances or decided cases, to the jury has been condemned by the decisions of our courts for many years in civil cases; and, for a shorter period, even in criminal cases. (See *People v. Bruner*, 343 Ill. 146, 175 N.E. 400.) In *McGinnis v. Cosmopolitan Nat. Bank & Trust Co.*, 114 Ill.App.2d 113, 252 N.E.2d 56, this court criticized such proceeding and pointed out that "[p]roper trial practice dictates that it is for the court to instruct as to the law and not counsel." 114 Ill.App.2d 113, at 117.

Plaintiff attempts to support his Instruction No. 3 on the ground that it is in the language of the applicable ordinance. This may be literally correct but it overlooks the points that this ordinance should never have been brought into the case in the manner attempted and that the instruction served only to compound other errors previously made, as above noted. We have carefully examined the record regarding plaintiff's contention that the defendants failed to preserve the point regarding error in this instruction. We find that this point was properly raised by defendants at the conference on instructions as well as in their post trial motion. In addition, the instruction itself was one facet of a proceeding which was erroneous from its inception. Defendants made repeated objections to the filing of the additional complaint predicated upon the ordinance, to the reading of various matters and the ordinance to the jury, to the resulting effective elimination of issues of negligence and contributory negligence in matters not covered by the Structural Work Act and finally to the instruction itself. We agree with the contention made by defendants that there was reversible error in this aspect of the case.

 The final point raised by O'Neil pertains to allegedly prejudicial final arguments made to the jury by plaintiff's counsel. O'Neil's brief details 23 instances of allegedly unfair argument. Counsel for O'Neil objected in certain, but not all, of these instances and these objections were overruled. In a strong response to this argument, plaintiff urges that the alleged improper remarks were taken out of context by O'Neil; they were not improper or prejudicial; and that no objection was made as to many or most of them. Plaintiff further urges, with good legal justification, that the control and direction of argument to the jury is within the discretion of the trial judge and that this court must indulge in every reasonable presumption that this discretion was properly exercised. (*Elizer v. Louisville & Nashville R.R. Co.*, 128 Ill.App.2d 249, 253-254, 261 N.E.2d 827.) O'Neil seeks to excuse its failure to object in every instance upon the theory that, since several objections had been

made and overruled, it was not necessary to repeat the objection. See *Bruske v. Arnold*, 44 Ill.2d 132, 137, 254 N.E.2d 453.

We need not pass upon these conflicting claims. The trial errors above indicated are alone sufficient to require reversal of the judgment and remandment of the cause. In addition, should the cause be tried again, the situation regarding argument is not likely to repeat itself. It will be sufficient for us, respectfully, to direct the attention of all counsel in this case to the splendid statement contained in the opinion of this court, speaking through Mr. Justice Schwartz, in *Durkin v. Lewitz*, 3 Ill.App. 2d 481, 495, 123 N.E.2d 151. The court denounced improper arguments in personal injury case as having "* * * a long and dishonorable tradition in jury trials * * *" and called upon all members of the bar for fair presentation in final argument and the avoidance of extremes therein as a matter of professional necessity.

■■ The final matter to be considered is the ruling of the trial court in directing a verdict for indemnity in favor of the City and against O'Neil. The conclusion above reached that the judgment in favor of plaintiff and against O'Neil and the City should be reversed and the cause remanded for a new trial, requires necessarily that the judgment for indemnity in favor of the City and against O'Neil also be reversed "* * * as it is dependent upon the outcome of the case in chief." (*Jones v. S. S. and E. Corp.*, 112 Ill.App.2d 79, 97, 98, 250 N.E.2d 829, citing *Bohannon v. Ryerson and Sons, Inc.*, 15 Ill.2d 470, 475, 155 N.E.2d 585.) But, since the point has been properly raised and briefed by the litigants, we shall decide it in the hope that this may at some future date facilitate a determination of the rights of the parties.

The right of the City to indemnity against O'Neil depends upon the provisions of the written contract between them and also upon the bond entered into in connection with performance of the contract. The contract required O'Neil to "* * * observe and comply with all Federal and state laws, local laws and ordinances and regulations which in any manner affect the conduct of the work * * *." O'Neil agreed to indemnify the City "* * * against any claim or liability arising from or based on the violation of such law, ordinance, regulation * * * whether by himself, or his employees."

■ The bond between these parties also provided for indemnity by O'Neil to the City "* * * against all suits or claims that may be based on any injury to persons or property * * * in the course of the performance of this contract * * * whether or not it shall be claimed that the injury was caused through a negligent act or omission of the contractor [O'Neil] or his employees * * * or of the City of Chicago or its employees * * *." The bond also required O'Neil

to indemnify the City "* * * against all loss, damages, claims, liabilities, costs and expenses * * * in consequence of the granting of said contract * * * or which may in anywise result in any injury or death to any persons * * * arising directly or indirectly from or in connection with work performed or to be performed under said contract by said contractor."

It is difficult to conceive of a stronger or more inclusive contract of indemnity. Not only is the general language sufficiently broad by itself to include indemnity against the negligence of the City itself as indemnitee (see *Deel v. United States Steel Corp.*, 105 Ill.App.2d 170, 184-185, 245 N.E.2d 109), but this contingency is expressly covered. Furthermore, the verdict of the jury necessarily included a finding that O'Neil had violated the Structural Work Act. This determination of the issue bound O'Neil and it could not be raised again to question the legal effect of the indemnity contract and bond. (*Sanitary District of Chicago v. United States Fidelity & Guaranty Co.*, 392 Ill. 602, 612, 65 N.E.2d 364; *Palmer House Co. v. Otto*, 347 Ill.App. 198, 106 N.E.2d 753.) Thus, the trial court was completely correct in directing a verdict for indemnity in favor of the City and against O'Neil.

The judgment in favor of plaintiff and against O'Neil and the City and also the judgment for indemnity in favor of the City and against O'Neil are reversed and the cause is remanded for a new trial on Count II of plaintiff's complaint.

Judgments reversed and cause remanded for a new trial.

Mr. JUSTICE EGAN specially concurring:

I concur with Mr. Justice Goldberg in his determination that trial errors require a new trial. The failure of the plaintiff to mention the ladder in his deposition, even though it might not constitute a direct contradiction, may be shown. *People v. Bonham*, 348 Ill. 575, 181 N.E. 422; *Carroll v. Krause*, 295 Ill.App. 552, 15 N.E.2d 323.

Count III, which was based on the ordinance, should not have been submitted to the jury. That Count alleged, in substance, that anyone who violated the specific sections of the ordinance or who did not comply with the provisions of the American Standard Safety Code *ipso facto* violated the Structural Work Act. I agree with Justice Goldberg's reasoning and holding with respect to the ordinance, but I would make a further observation. In my opinion, chapter 76-1 (b) may not support even a negligence count. That subsection provides: "The provisions of the American Standard Safety Code for Building Construction of the American Standard Association * * * shall be considered as accepted engineering practice with respect to safeguards during construction." This subsection constitutes an unlawful delegation of legislative

authority to the American Standard Association. (See *Garces v. Department of Registration and Education*, 118 Ill.App.2d 206, 254 N.E.2d 622.) While not necessary to my decision and, concededly, not raised in the trial court, I wish to make my views known on the question of delegation of power lest my silence be construed as a tacit recognition of its validity.

The dissenting opinion of Justice Adesko maintains that the claim that the statute is a nullity was never asserted by the defendants and was, therefore, waived. The opinion further states that the defendants' only objection made at the conference went to the applicability, and not the invalidity, of the ordinance. At that conference, the trial judge stated that they had gone over the instructions for three hours, apparently without a court reporter, and that he would give each party the right to make his objections for the record. He then said that he would give plaintiff's instruction 1, 2 and 3. The following ensued:

> "Mr. French: With regards to plaintiff's tendered Instruction number 3, the City of Chicago objects to it on the ground, first of all, that it's an attempt to state two separate causes of action actually based upon the same statute, and on the further ground that to incorporate the ordinances is to go into a negligence type cause of action, which was dismissed preemptorily [*sic*] by the plaintiff * * *.

> Mr. Valentine: On behalf of the Defendant O'Neil we wish also to object to plaintiff's tendered Instruction number 3 and will adopt the argument as advanced by counsel for the City of Chicago * * *."

Both lawyers made the further objection that the evidence did not show the applicability of the ordinance. Further, the answer of O'Neil and the argument of Mr. French on the motion for directed verdict presented the issue in the trial court.

In the brief of O'Neil the following appeared at page 41:

> "Despite the repeated objections of defense counsel, the trial judge permitted the plaintiff to plead, argue and submit to the jury a theory of liability which was *totally unwarranted in the law*. The hybrid theory raised—in effect a 'City of Chicago Structural Work Act'—represented clear error. It seriously prejudiced the defendants and requires a reversal of the cause." (Emphasis added.)

The brief points out further, with appropriate references to the abstract, that all through the trial they had insisted that, though the ordinance might give rise to a cause of action for negligence, it could not be the basis of a Structural Work Act complaint. The brief says expressly: "But the City of Chicago *could not and did not* create a new right of action

[under the Act]." (Emphasis added.) It thus appears to me that the question was indeed raised in the trial court, and, equally important, the briefs of all parties have put the issue clearly before us. Significantly, the plaintiff does not claim, as does the dissent, that the defendants waived the point by not raising it in the trial court. I must also disagree with the assertion that we have declared an ordinance unconstitutional, "*sua sponte.*" When O'Neil argued in its brief that the City of Chicago could not pass an ordinance expanding the Structural Work Act, that was tantamount, so far as I am concerned, to saying that the City had exceeded its authority and that, therefore, it had usurped power vested in the legislature.

The dissent states: "It was not only proper but mandatory for the trial court to permit plaintiff's pursuit of the local remedy *on a par* with the State statute * * *." (Emphasis added.) First, there is no objection on the part of the defendants to the plaintiff's pursuit of a local remedy, but on a negligence basis; second, it seems that the plaintiff himself took the position that the ordinance was more than "on a par" with the statute when he argued to the jury that the City adopted the same law "and put a few more teeth in it."

I must further disagree with the dissenting opinion that we have departed from the holding in *Kaspar v. Clinton-Jackson;* or that the *Kaspar* court distinguished and approved the negligence action as being separate from the Act and the ordinance; and that the *Kaspar* court, if it had felt that the ordinance exceeded the bounds of the statute or could only be pursued as a negligence action, would have said so. The reason I disagree is that the point was never presented to the *Kaspar* court. The only points raised in the *Kaspar* appeal were a refusal to allow an exhibit to go to the jury; a refusal to give a special interrogatory; and excessive damages.

I fail to see how *Nelson v. Union Wire Rope Corp.,* cited in the dissent, is authority for the proposition that a party may read ordinances to the jury. As the language of the opinion quoted in the dissent indicates, the court simply held that the point had been waived by failure to raise it in the post-trial motion.

Nor do I see the applicability of *Logue v. Williams* to the dissent's holding that a "basic rule of impeachment *prohibits* allusion to a statement * * * where a party admits that his opinion has been altered by some circumstance. At that juncture no further inquiry *can* be made." (Emphasis added.) The rule of *Logue v. Williams* provides that, if the witness admits having made the impeaching statement, the adverse party *need not* go further. That is hardly the situation in this case where the defendant was not even permitted to ask the question of the

plaintiff. For these reasons I adhere to my view that a new trial is required.

I further agree with Mr. Justice Goldberg that the trial court properly excluded the hospital report because a proper foundation was lacking; that plaintiff's instructions number 4, 5, and 9 and Court's instruction number 1 were properly given; that the evidence was sufficient to support a finding that O'Neil was in charge of the work; and that the agreement bound O'Neil to indemnify the City of Chicago. While some, but not all, of the remarks of the plaintiff's attorney in his final argument were better left unsaid, I do not believe that his argument constituted reversible error.

I would, however, go further and hold that the evidence fails to show the applicability of the Structural Work Act or that O'Neil or the City were guilty of a wilful violation of the Act.

Two basic principles must be noted: the plaintiff has the burden of proof; and he is bound by the allegations of his complaint.

The plaintiff testified that, after he went around the first wall, he turned on his flashlight because the electric lights were not working. He was walking along with his light shining on the floor, checking from time to time for debris and material lying on the floor. When something hit his arm, he dropped the flashlight, which went out, and he started searching for it. Previously, he had noticed the debris the City Inspector had told him about. There was a little spillage of concrete. As he was going around the different bays, he noticed there was "red wood, that was going to be installed and iron angles, channels, that were going to be installed in [the] machinery" on the sides. After looking at hospital records, his memory was refreshed as to how he fell in the maze:

"A. I was searching—feeling with my feet and bent over with my hands trying to find my flashlight, and I tripped and losing my—trying to regain my balance, I felt the edge of a ladder and rungs, and it slid along a little bit with me. And I remember falling into space. And that's all that I remember until I come out of the hole."

Later in his testimony, he said that he had previously sent two men down to the location to clean up some debris. He explained that, when the forms are taken off by his employer, some concrete and small pieces of lumber that were built around the forms to brace them fall off. When he was there four days before the accident, he saw a barricade at the point where he fell. This was a long piece of 2 x 4 running diagonally from the floor about three feet up and braced or rested against another short piece of 2 x 4, which was braced against the wall. On cross-examination he testified:

"A. My flashlight, I dropped it, and I bent over—I heard the light fall. It went out and it sounded like it was rolling just ahead of me and I bent over, trying to feel for the light and scraping with my feet at the same time, feeling for it, and I took two, three steps, maybe four, and I tripped over a ladder, and in trying to regain my balance, the ladder shifted with me and I could feel the rungs as my hands swung along and then I fell into space."

John Ryan testified for the plaintiff that at the time of the occurrence he was a co-employee of the plaintiff. The day after the accident he and another man went to the hole where the plaintiff had been injured. He then said:

"A. Well, we shined the light down there and saw a hard hat and some other belongings, and I climbed down there on a ladder.

Q. Where did you find this ladder?

A. I don't remember if it was in the hole already or if I put it down there. I was rather anxious because I had found some things."

From this evidence Justice Goldberg concludes "that it is difficult to determine from the record if the ladder was lying on the concrete floor or was in place between the intermediate level and the sub-basement, protruding above the floor of the former," and I agree. However, it is the position of the plaintiff that the ladder was placed and used in the hole where he fell and that the "end of the ladder protruded from the opening into the darkened baffle area." He is in the best position to interpret the meaning of his own testimony. In addition, since only ladders of less than 10 feet were used by Link Belt, it is difficult to see why anyone would place a ladder 18 feet long on that floor. Since the hole was approximately 10 feet by 10 feet, maneuverability of an 18 foot ladder would be relatively difficult. We must under the circumstances accept the plaintiff's interpretation.

I advert to the evidence and the contentions of the plaintiff because Justice Goldberg finds "no problem in concluding that the concrete floor from which the plaintiff fell was a scaffold or support within the requirements of the Act." Whether the concrete floor was or was not a scaffold is debatable, but immaterial, because the plaintiff does not so allege in his complaint. He does not claim that the concrete floor was a defective scaffold. If that were one of the bases of his claim of a wilful violation, it would not matter under *Schultz v. Erickson, Karris v. Goldwin, Spiezio v. Commonwealth Edison* or *Louis v. Barenfanger,* cited by Justice Goldberg, whether it was a ladder, debris, or anything else that caused him to trip and fall. Consequently, I do not see the applicability of

these cases to the evidence and pleadings here. His claim, rather, is based first on the assertion in paragraphs 5 (a) and (b) of Count II:

"(a) [The defendant] [c]aused, permitted or failed to discover a ladder that was improperly placed or situated in an area where workmen might have occasion to be walking by, *at or near* there; [emphasis added]

(b) Caused, permitted or failed to discover a ladder that was improperly placed adjacent, near or in an unbarricated [*sic*] hole;"

The pleadings, the argument of plaintiff's counsel at the trial and in his brief, and the statement of counsel at oral argument make it clear that, but for the fact that a ladder was involved in some way, this claim would be for negligence and not under the Structural Work Act. To illustrate, this case had been filed under common law negligence and had remained so for five years. It was after the plaintiff had refreshed his recollection from the hospital record before trial and remembered that a ladder was involved that the complaint was amended. Parenthetically, I note the hospital record shows: "* * * Patient states while working *he fell down from sladder* [sic] losing consciousness for a few hours. * * *" (Emphasis added.)

Section 60 provides that all "ladders * * * shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons *employed or engaged thereon*, or *passing under or by* the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." (Emphasis added.) The plaintiff concedes that this case does not involve the life and limb of any person "employed or engaged" on the ladder. The question then becomes the interpretation of "passing under or by," not, as the complaint alleges, "walking * * * at or near." The plaintiff refers to the title of the Act itself and *Bennett v. Musgrave*, 130 Ill.App.2d 891, 266 N.E.2d 128, as authority for the proposition that the Act provides for the protection and safety of persons "in and about" the construction. That language does appear in the title and the case cited, but the term "in and about" is an all-inclusive one, embracing those employed or engaged on the device as well as those passing under or by it. In the *Bennett* case, the plaintiff was injured by a wrench which was dropped from a scaffold above him. The only reasonable interpretation of the Act, with full recognition that it is to be construed liberally, requires that the ladder be so placed and operated as to prevent material, tools or the ladder itself from falling on any persons passing under or by it, including persons not involved in the con-

struction. In every case our research has disclosed involving recovery under the Act, either the person on the device was injured, or a person walking under or by it was struck by some falling object. (*E.g., Bennett v. Musgrave,* 130 Ill.App.2d 891, 266 N.E.2d 128; *Brackett v. James Black Masonry & Contracting Co.,* 326 Mo. 387, 32 S.W.2d 288; *Koepp v. National Enameling and Stamping Co.,* 151 Wis. 302, 139 N.W. 179; *Skinner v. United States,* 209 F.Supp. 424.) In every other case involving ladders, the claim was for common law negligence. (*E.g., Hill·v. Lundin & Associates, Inc.,* 260 La. 542, 256 So.2d 620; *Barnard v. Trenton-New Brunswick Theatres Co.,* 32 N.J. Super.· 551, 108 A.2d 873.) In other words, to invoke the coverage of the Act, it must be shown that the injury was caused when the ladder was used as a ladder. If the position of the plaintiff is correct, then the Act is applicable, assuming ongoing construction, regardless of where the injury occurs as long as one of the devices named in the statute is involved. Thus, if a ladder (or hoist, crane, stay, etc.) were placed against the building outside on the ground, and the plaintiff tripped over any of them and injured himself, the Act would be applicable. As was said in another setting in *Vykruta v. Thomas Hoist Co., Inc.,* 75 Ill.App.2d 291, 302, 221 N.E.2d 99: "Such an interpretation of the statute places too much strain on its wording."

I must also conclude that the plaintiff has failed to prove that O'Neil or the City wilfully violated section 60. In *Lavery v. Ridgeway House, Inc.,* 117 Ill.App.2d 176, 254 N.E.2d 117, the plaintiff was a truck driver delivering cement to a construction site. While riding on a material hoist it began to shake. In an attempt to balance himself his hand was injured when it was caught between the hoist cable and an uncovered pulley. A material hoist is open, and a passenger hoist is closed by a cage. The appellate court pointed out that the hoist was not defective or in a dangerous condition and that it was designed to carry material and not personnel. (See also *Vykruta v. Thomas Hoist Co., Inc.,* 75 Ill.App.2d 291, 303, 221 N.E.2d 99.) In this case, there is no showing that the ladder was defective or dangerous, or that it was *improperly* placed or situated. All that the plaintiff has shown is that the ladder was there, and nothing else. Consequently, he has failed to prove the allegations of his complaint that section 60 had been wilfully violated.

The plaintiff alleges that the defendants violated the Act in that they:

"(c) Caused, permitted or failed to require contractors or subcontractors to furnish or provide adequate lighting to enable workmen to discover a ladder improperly placed or situated next to or in an unbarricated [*sic*] hole;"

The plaintiff refers to no section of the Act nor any case which would support his contention that failure to provide adequate lighting consti-

tutes a wilful violation of the Act. The provisions of the Act are not to be equated with the obligation to provide a safe place to work. (*Parizon v. Granite City Steel Co.*, 71 Ill.App.2d 53, 218 N.E.2d 27.) Assuming, solely for the sake of the plaintiff's argument, that the failure to provide adequate lighting could be the basis of recovery under the Statute, I must conclude that the evidence fails to disclose a wilful violation by the defendants. O'Neil had removed its lighting in March and was not in the area at the time of the accident. The plaintiff's employer had put in its own lights, and its men were working shortly before and on the morning of the accident. The plaintiff's duties included checking the lights. It is not reasonable to say that O'Neil or the City should be charged with the knowledge that the lights were not working when the plaintiff himself did not know it. *Lavery v. Ridgeway House, Inc.*, 117 Ill.App.2d 176, 188, 254 N.E.2d 117; *Vykruta v. Thomas Hoist Co.*, 75 Ill.App.2d 291, 303, 221 N.E.2d 99.

The last allegation of paragraph 5 is as follows:

"(d) [The defendants] failed to erect, supply or provide a safe, suitable and proper barricade over an opening or shaft that had been used to hoist material."

This allegation charges a violation of section 66 of the Act, which basically provides that, if elevating machines or hoisting apparatus are used in a building during the course of construction for the purpose of lifting materials to be used in such construction, then the contractors or owners shall cause the opening to be enclosed or fenced on all sides by a substantial barrier or railing at least eight feet in height.

I agree with Justice Goldberg that *McGinnis v. Cosmopolitan National Bank and Trust Co.*, 114 Ill.App.2d 113, 252 N.E.2d 56 is not applicable here. In that case a hole in the floor had been cut for the purpose of installing a dumbwaiter or elevating hoist. The plaintiff walked over to the hole, "placed her hand on a protective wooden board about three feet high, leaned over [the] barrier and fell into the basement * * *." The dumbwaiter was being put in the building to enable the employer to move certain material from the basement to the first floor more easily. The appellate court, in holding that section 66 was not applicable, said: "In the case at bar, the hoist or dumbwaiter was not being used for the purpose of elevating any materials in the construction or alteration of the building, but was to be the structure itself." The court distinguished *Claffy v. Chicago Dock and Canal Co.*, 249 Ill. 210, 94 N.E. 551: "In that case, there was no dispute but that the plaintiff fell into a shaft which was used for a hoisting machine admittedly *then being used* in the construction or alteration of the building." (Emphasis added.)

In this case, if the accident had occurred on the previous Thursday

when, the witnesses testified, the area was being used as a hoistway, the plaintiff's argument that there was an obligation to provide or require barricades might be tenable. Justice Goldberg contends that the evidence is conflicting as to precisely when the hoisting of materials through the hole was completed. There is no conflict, however, in the testimony that establishes that it was completed before the day plaintiff was injured. The undisputed evidence, including the testimony of the plaintiff's witnesses, leads to no other conclusion but that the areaway into which the plaintiff fell was no longer being used as a hoistway on the day of the accident. O'Neil had closed the hole at roof level, as the plans required. Link Belt had completed its work in the area, save cleaning up. The area was to be permanently under water; consequently, the barricades had been removed. Ryan, the plaintiff's witness, said that the hole that had been used for hoisting the previous week was "holed up" and was not used for hoisting on the day the plaintiff was injured.

Under this evidence, I conclude that the duty to barricade no longer existed. The nature of the structure required that the barricades be removed; all construction work at this particular site, including hoisting, had ceased. If, as the plaintiff seems to contend, once a hoistway always a hoistway, the barricades could never be removed without subjecting the party in charge of the work to liability. For example, under this theory, if the men removing the barricades fell into the unbarricaded hole, liability would attach. (See *Korfanta v. Vanderbilt Ave. Realty Co.*, 193 App.Div. 763, 184 N.Y.S. 503.) In the *Korfanta* case, after most of the construction had been completed, the plaintiff returned to perform some minor repairs and fell down an unguarded elevator shaft. The Court held that the duty to guard the shaft under the evidence no longer existed.

Justice Goldberg further contends that, even if O'Neil had actually suspended or completed its hoisting activities as well as its other work in the particular area in question before the occurrence, since they were (or could be found to be) in charge of the work, they may still be held liable under the Act. With the proposition that O'Neil would not be excused simply because *he* had completed his hoisting activities, I am in complete agreement, but the plaintiff must prove that *someone* was using the hole as a hoistway on the day in question, and I submit he has not. The case of *Pantaleo v. Gamm*, 106 Ill.App.2d 116, 245 N.E.2d 618, cited by Justice Goldberg, is factually inapposite. In that case, the general contractor left a material hoist on the jobsite; there were no ladders, scaffolds, or personnel hoists on the site. The material hoist was the only means available to get from the ground to the roof, thus requiring its use. The plaintiff, while standing on some material piled on the hoist,

was injured when the hoist began to shake and his hand was caught in the cable pulley. It is apparent that the proscribed condition existed at the time of the injury, *i.e.*, the presence and required use of a defective hoist. In this case the proscribed condition, *i.e.*, an unbarricaded opening *being used* as a hoistway, did not exist at the time of the injury.

For these reasons I conclude that the plaintiff has failed to prove the applicability of the Structural Work Act or that the defendants were guilty of any wilful violation of the Act. I would, therefore, reverse the judgment.

Mr. JUSTICE ADESKO dissenting:

I respectfully dissent from the majority opinion. I think this case should be affirmed for multiple reasons. The defendants do not dispute the seriousness of the injuries, including brain damage, nor the amount of the verdict of $150,000. Insofar as Count II is concerned, relating to violations of the Illinois Structural Work Act, the majority concedes that: (1) the Structural Work Act applied to the facts in this case; (2) the area on which plaintiff stood and from which he fell was a platform within the purview of that Act; and (3) there is a violation of the Structural Work Act in defendants' failure to barricade the area from which plaintiff fell. All of the elements necessary to affirm this judgment exist here. The majority holding has effectively departed from the established rule that if a judgment is sustainable on any count, alleged error affecting other counts, in this case Count III relating to the applicability of chapter 76 of the City of Chicago ordinances entitled "Safeguards During Construction", is immaterial. *Jordan v. Savage,* 88 Ill.App.2d 251, 260.

The *ratio decidendi* of my colleagues' reversal is as follows: Since the ordinance admittedly adopts the Structural Work Act, and also "expands" the provisions of the statute, the ordinance is therefore a nullity. However, the claim that the statute is a nullity was never asserted by defendants and was therefore waived. (*Haymes v. Catholic Bishop of Chicago,* 33 Ill.2d 425, 211 N.E.2d 690.) The objections made in the conference on instructions, after the parties had stipulated the project contracts were admissible, raised no contention that the ordinance was a nullity. The defendants' objections went only to the applicability of the ordinance.

Although the term is not actually used, this decision results in an outright declaration of unconstitutionality. The majority conceded that presentation and preservation of a constitutional question was never proposed to the trial court; and no ruling essential to our authority to review, was ever made. (*City of Chicago v. Birnbaum,* 274 N.E.2d 22, 49 Ill.2d 250.) Hence, the declaration that the ordinance is a "nullity,"

therefore unconstitutional, is improper and unauthorized, as a court of review cannot, *sua sponte,* undertake to declare statutes or ordinances unconstitutional.

Implied in the majority opinion is the suggestion that the ordinance may have been applicable, and plaintiff's instruction No. 3 proper, if it had been tendered in a count sounding in negligence and not as a mandatory requirement akin to that of the State Statute.* The majority overlooks the fact that the negligence count had been dismissed by plaintiff before the trial commenced. The rationale buttressing the majority opinion is contained in the phrase that "a municipality cannot enact a law that is designed to overrule or conflict with a sovereign statute." There is obviously, no quarrel with the correctness of that statement— a municipality cannot enact laws in conflict with a sovereign state. It is not true, however, that a municipality may not enact an ordinance designed to implement and put into effect the intent and/or purpose of a State law, for it is well settled that municipalities may exercise police power concurrently with the State, and that police regulations may differ from those of the State on the same subject, if not inconsistent therewith. 10 I.L.P. No. 1105, p. 22, *City of Highland Park v. Curtis,* 83 Ill.App.2d 218, 226 N.E.2d 870.

*Jones v. City of Chicago,* 348 Ill.App. 310, 108 N.E.2d 802, is another instance of a holding contrary to the majority opinion. In *Jones,* a city ordinance exceeded the "bounds" of a state statute without sacrificing its effect. Justice Burke, of the First Appellate District, approved an ordinance requirement for insurance on cabs which was double the amount required by State law in the following language:

"\* \* \* An ordinance, because of local conditions, may impose more rigorous or definite regulations under a proper delegation of power in addition to those imposed by the State. *Dean Milk Co. v. City of Chicago,* 385 Ill. 565, 53 N.E.2d 6121, and *City of Chicago v. Union Ice Cream Mfg. Co.,* 252 Ill. 311, 92 N.E.2d 872. In our opinion the $50,000 and $100,000 public liability insurance requirement is not oppressive or unreasonable."

---

* A mandatory requirement has been recognized in the recent case of *Lincoln Park Realty, Inc. v. Chicago Commission on Human Relations,* 9 Ill.App.3d 186, 189, 292 N.E.2d 116, where it was said: "Whether statutory language is directory or mandatory is ultimately a question of legislative intent to be ascertained from the nature and objective of the provision. (*Carr v. Board of Education,* 14 Ill.2d 40, 150 N.E.2d 583; *Zbiden v. Bond County Community Unit School Dist. No. 2,* 2 Ill. 2d 232, 117 N.E.2d 765.) Nevertheless it has been ordinarily held that 'negative, prohibitory, or exclusive words are generally construed as mandatory when employed in statutory provisions.' (82 C.J.S. 875.) Our Supreme Court has also recognized that principle."

It is abundantly clear that there exists concurrent jurisdiction over Chicago citizens in this and other fields, and the construction ordinance appearing in Chapter 76 of the Ordinances of the City of Chicago, in adopting the State statute and localizing it to meet conditions peculiar to the city, did not intend to conflict but rather was designed to implement and insure its enforcement.

To declare an ordinance null because of expanding or implementing provisions is to invalidate many city ordinances. There would exist an anomaly—that the State's requirement of mandatory compliance could not be paralleled in City ordinances. Cities could not enact mandatory requirements in construction trades in parallel fields. The misunderstanding lies in the majority believing that municipalities can only use the scaffold ordinances as a negligence matter.

The effect of all this is to declare unconstitutional *all* ordinances which remotely touch on the same subject matter under the guise that cities have been "pre-empted" by State statute. The well-known doctrine that ordinances and statutes may be read together, harmonized and concurrently put into effect would be shelved by the instant opinion. In short, all municipalities would abdicate their responsibility to their own citizens —all of this being contrary to common sense and judicial consistency. (See also, *Town of Cicero v. Weilander*, 183 N.E.2d 40, 35 Ill.App.2d 456.) My colleagues, however, fail to distinguish between an ordinance which tends to enforce a statute (which a simple comparison of the two proves is the fact here) and another which may be totally antithetical to it.

A specific example of an implementing ordinance appears in *Treadway v. City of Rockford*, 24 Ill.2d 488, 182 N.E.2d 219. Under State law (Ill. Rev. Stat., 1959, ch. 24, par. 73—8) zoning ordinances may be amended, but only after notice in a newspaper of a hearing before some commission or committee. The Rockford zoning ordinance expanded the ambit of the zoning board by dispensing with newspaper notices and permitting property owners to initiate, by petition, proposed changes in ordinances. In approving the additional or "expanded" requirements of the zoning ordinance, our supreme court said:

> "* * * It is obvious that when a statute prescribes certain steps as conditions to the enactment of an ordinance these steps must be substantially complied with, and we have further held that where a general zoning ordinance includes additional procedural requirements for its amendment, not inconsistent with those of the statute, these requirements must also be complied with. (*Cain v. Lyddon*, 343 Ill. 217, 175 N.E. 391.)"

In *Chicago Cosmetic Co. v. City of Chicago*, 374 Ill. 384, 29 N.E.2d

495, the Illinois Supreme Court approved two local ordinances of the City of Chicago although there were numerous variations as to chemical and paint factories licensing encompassed by the ordinances and not contained in chapter 11.2 of the statutes. The supreme court said in *Kizer v. City of Mattoon*, 332 Ill. 545, 164 N.E. 20, 22:

> "While municipal ordinances must be in harmony with the general laws of the state, and in case of a conflict the ordinance must give way, the mere fact that the state has legislated upon a subject does not necessarily deprive a city of power to deal with the subject by ordinance. Police regulations enacted by a city under a general grant of power may differ from those of the state upon the same subject, provided they are not inconsistent therewith."

This departs from holdings in another division of this appellate district, for a division of this court has recently held that the very ordinance involved here creates a mandatory and separate cause of action consistent with, although parallel to, the Structural Work Act of the State of Illinois. The court also held the violation of the instant ordinance was unrelated to negligence in *Kaspar v. Clinton Jackson*, 118 Ill.App.2d 364, 254 N.E. 2d 826. There, three separate counts were contained in plaintiff's second amended complaint (Count I—violation of the Structural Work Act; Count II—violation of the Safeguards During Construction Ordinance; and Count III—negligence). As in the instant case, the contracts contained broad language. Again, as in this case, plaintiff, an employee of a sub-contractor, was injured as a result of a fall and because of the failure to provide barricades. Although the opinion primarily concerned third party issues, both the trial and appellate courts distinguished and approved the negligence action as being separate from both the "Structural Work Act" and "Safeguards During Construction" ordinance. Had the *Kaspar* court felt that the ordinance exceeded the bounds of the statute and/or could only be pursued as a negligence action, the opinion would have so indicated. It did not. (Petition for leave to appeal was denied by the Illinois Supreme Court.)

It is said in the instant case, in justification, that there is a conflict between the statute which affixes liability to those "in charge," and the ordinance which applies to everyone "having control or supervision." But this would not be a proper basis for declaring the ordinance a "nullity". That argument was rejected by our supreme court in *Larson v. Commonwealth Edison Co.*, 33 Ill.2d 316, 321, 211 N.E.2d 247, in the following language:

> "While it may be conceded that some of the decisions in this jurisdiction involving the Scaffold Act appear to have equated 'having charge' with '*supervision and control*' in varying degrees,

it is our opinion the language of the statute, and the legislative intent it reflects, do not permit the conclusion that the terms are the inflexible and unbending legal equivalent of the other. The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould,* 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge', they are not necessary or conclusive factors, nor is either made a *sine qua non* for liability under the statute. Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure." (Emphasis added.)

It was not only proper but mandatory for the trial court to permit plaintiff's pursuit of the local remedy on a par with the State statute: (1) To avoid confusion in interpreting the identical act; and (2) To give local validity to the sovereign statute. Plaintiff's instruction No. 3, therefore, was the City's personification of the Structural Work Act, even if the ordinance provided that the American Standard Association rules should be considered as accepted engineering practice. In this regard, no objection was made by either defendant, and, certainly, no state rule or provision of the statute was emasculated; on the contrary, those affected by the ordinance were well advised of the accepted requirements in their industry, and since negligence was not involved in Count III, the instruction appropriately omitted reference to negligence, contributory negligence and the like.

The majority has improperly considered the evidentiary rationale in permitting the introduction and reading of evidence relating to the various standards or safety regulations. As appears from the record, all these documents and statutes were obligatory requirements included and incorporated in the contracts. The contracts were admitted into

evidence by stipulation and the portions read to the jury were by agreement of the parties, excepting those relating to indemnity agreements. My colleagues make it appear as though *case law* were read to the jury, when such is not the fact. There were no quotes from cases, but allusions were only to the Structural Work Act requirements, local ordinances and standards contained in the contracts and determinative of violations of those laws (reflecting upon the method of avoiding injury during construction)—all without objection. This appears in the transcript of proceedings, wherein the plaintiff's attorney was examining a witness under section 60 of the Illinois Civil Practice Act (Ill. Rev. Stat., ch. 110.)

"Q. Under the provisions of the contract that O'Neil received from the City of Chicago, there were certain conditions. Do you remember them?

A. Well, I don't know exactly what you are referring to, no.

Q. I am talking about the conditions—where is that?—that I think are called general conditions, special conditions.

A. Yes, that's correct.

Q. This is Plaintiff's Exhibit 2, a copy of the contract conditions that O'Neil agreed with the City of Chicago about (indicating).

A. Yes, that is part of our contract.

Q. And I take it you are familiar with these conditions.

A. Yes, sir.

Q. What is your function as the person in charge, to see that the conditions or requirements are complied with?

A. Yes.

Q. Now is one of these conditions with which you are familiar as follows on page D-4, Section 2.1? That reads as follows:

'The contractor shall at all times observe and comply with all federal and state laws, local laws, ordinances and regulations which in any manner affect the conduct of the work, and all such orders and decrees as exist at the present and which may be enacted later, of legislative bodies tribunals having legal jurisdiction or authority over the work, and no plea of misunderstanding or ignorance thereof will be considered.'

\* \* \*

MR. VALENTINE: If the Court please, I believe we stipulate that Mr. Heuer has a general familiarity with this entire contract and the portions that Mr. Phillips is referring to.

I think we have already agreed that we have stipulated to this, that the pertinent portions of the contract would be admitted into evidence and the immaterial portions would not be.

\* \* \*

MR. PHILLIPS: Well, it's in evidence now and I certainly would have a right to read it anyhow.

THE COURT: Let him look at it. We agreed that only the pertinent parts would go in.

MR. VALENTINE: No objection to that.

MR. PHILLIPS: All right.

\* \* \*

'The safety provisions of applicable laws, building and construction codes, shall be observed. Machinery, equipment, and all hazards shall be guarded or eliminated in accordance with safety provisions of the Manual of Accident Prevention in Construction published by the Associated General Contractors of America, to the extent that such provisions are not in contravention of applicable law.'

You are acquainted with that?

A. Yes, sir.

Q. And this is the book, I believe, that is alluded to (indicating). Is it not this manual?

A. That's correct.

Q. And as general contractor, I think O'Neil belonged to this organization. Did it not?

A. That's correct.

Q. Is one of those provisions relating to barricades? Are you familiar with that?

A. Yes, there would be a section on barricades.

\* \* \*

Q. Going to page E-1 of the general conditions, were you acquainted with this provision (indicating)?

THE COURT: Give him a chance to see that.

MR. PHILLIPS: 201, at the top.

\* \* \*

MR. PHILLIPS: The very first paragraph.

\* \* \*

MR. VALENTINE: No objection to that.

MR. PHILLIPS: All right. This is entitled '201-Plant Procedure, Methods, and Equipment.' It reads as follows:

'The contractor shall determine the method to be employed, and the procedure to be followed, the equipment, plant falsework, shoring, bracing other temporary structures and equipment to be used on the work under this contract, subject to

the requirements of the contract documents and the approval of the engineer. Only adequate and safe procedure, methods, structures, and equipment shall be used.'

Q. Do you recall that section?

A. Yes, sir.

Q. Was adequate lighting one of the safe procedures?

A. Yes.

Q. And was the use of a barricade in a hole that was unguarded also required under the safe procedure understanding that you as a general contractor had?

\* \* \*

A. Yes."

The general rule, in this regard, is that if otherwise admissible, no error is committed by the introduction of these provisions, especially since O'Neil's own witness conceded during his adverse examination that he was familiar with these standards and knew that his employer was required to comply with the very provisions that would have prevented the plaintiff's fall into a lower level.

*Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769, involved a collapse of a hoist during construction wherein nineteen workmen were seriously injured. The trial judge in *Nelson* was the trial judge in the instant case. He was affirmed in *Nelson* and should be affirmed here for the identical reasons. In approving the propriety of reading the ordinances of the City of Jacksonville, Florida, the Illinois Supreme Court said:

"Prior to the occurrence here the city of Jacksonville, Florida, passed an ordinance which adopted by reference a building code known as the 'National Building Code,' and also an ordinance adopting by reference the 'American Standard Safety Code for Elevators, Dumbwaiters and Escalators' compiled by the American Standards Association. These ordinances were introduced in evidence by plaintiffs, and counsel for plaintiffs and the co-defendants Union Wire and Archer Iron were permitted to read portions thereof to the jury, over repeated objections by defendant American Mutual, first, that neither code applied to construction hoists, and second that the ordinances were invalid and did not come into effect because a State statute had pre-empted the field of elevator regulation. That ruling on this evidence is complained of, the defendant raising the same contentions on appeal. The first point, however, was not raised in defendant's written motion for a new trial so as to preserve it for review and will not be considered. Where a party files a motion in writing for a new

trial, specifying therein the grounds or reasons for such motion, he will be restricted, in a court of review, to the grounds or reasons specified in such written motion and will be deemed to have waived all other grounds or reasons for a new trial. (*County Board of School Trustees v. Batchelder,* 7 Ill.2d 178, 183-184; *Lukich v. Angeli,* 31 Ill.App.2d 20, 28.) As the matter comes to us, the ruling of the trial court that the ordinances had application to construction hoists cannot be questioned." 31 Ill.2d 69, 113-114.

The majority holds that impeachment of the plaintiff should have been permitted. The material evidence in question, as related to the Structural Work Act issue, would not permit inquiry on the subject matter claimed to be reversible error for the initial reason that it concerned, if at all, alleged contributory negligence of the plaintiff. Whether plaintiff bent over or scraped his feet after his flashlight fell or touched the ladder prior to falling in the lower level is totally irrelevant. This inquiry was not material because contributory negligence was not a defense, as the negligence count was not before the jury. In *Able v. Pure Oil Co.,* 8 Ill. App.3d 558, 290 N.E.2d 335, the court said:

> "Where the action charges a knowing violation of the Structural Work Act the plaintiff is not required to prove his own due care and plaintiff's contributory negligence may not be urged as a defense. (*Rovekamp v. Central Construction Co.,* 45 Ill.App.2d 441, 195 N.E.2d 756.)"

Factually, my colleagues concede that, by the overwhelming evidence, it is undisputed that the plaintiff was injured by the failure to have erected barricades (barricades are required in both the statute and the ordinance). It is also undisputed that plaintiff's fellow workmen found his flashlight and other equipment in the hole the following day. O'Neil's foreman also admitted that a ladder was found in the hole after plaintiff's injury, and that he had used it himself just days before. Everyone who testified agreed, and the photographs introduced in evidence showed, that there was no barricade at the site where plaintiff fell. Therefore, even if plaintiff had not testified at all, or irrespective of the existence of a ladder, or whether he touched the ladder at any time before he fell, the evidence affords no conclusion other than that plaintiff was injured in the fall in the shaft.

There are other reasons why the impeachment was improper even if the plaintiff's claim were based on negligence, which it was not. The statements were inadmissible because (1) they were not materially impeaching; and (2) the plaintiff had admitted that the deposition version was erroneous.

O'Neil has imposed on this court by making it appear that there is

substantial discrepancy between the court testimony and plaintiff's statements in the deposition. The testimony militates against O'Neil. The plaintiff testified in court that he encountered a ladder *after* taking three or four steps. The deposition question varied in time from the court testimony and concerned what happened to the plaintiff *during* the three or four steps and not after—the two did not parallel or cover the same time interval. The record bears this out:

"Q. And then what did you do?

A. I bent over and was feeling, you know, with my hand and scraping your feet along, feeling for the light, because, you know, the sound in the whole room travels and it sounded like it was just ahead of me, and I kept walking and bent over and feeling and I fell. That's all I remember."

Before one may be impeached, it must appear that the testimony on the stand is materially different than that given previously, thereby going to the credibility of the witness. Defendants seek to obtain an advantage by reading from a deposition after plaintiff had conceded on direct examination that he may have been mistaken in the deposition. He further testified that since giving his deposition, he refreshed his memory from the hospital records, which showed he told the admitting intern he had fallen over a ladder. During his direct testimony, the following transpired:

"Q. Now, you gave a deposition some time ago back in 1965, didn't you?

A. Yes, sir.

Q. Did you have a clear memory about everything that happened to you the day of this incident, all the time?

A. No, sir.

Q. Is there something that you've seen that brought back some of these things?

A. Yes.

Q. What did you see?

A. I seen a hospital report.

Q. What did that bring back?

* * *

A. I've seen some hospital reports, some pictures.

MR. PHILLIPS: Q. What did that bring back to your memory when you saw these hospital reports?

A. What I told the doctor that was exam—that examined me when I was taken to the hospital.

* * *

Q. When did you see those records?

A. Couple of weeks ago.

Q. What did you then remember as to what had happened in detail?

\* \* \*

Q. What did you then remember after looking at these records?

A. About how I—how I fell in the—in the maze.

Q. Okay. How did you fall in the maze?

A. I was searching—feeling with my feet and bent over with my hands trying to find my flashlight, and I tripped and losing my—trying to regain my balance, I felt the edge of a ladder and rungs, and it slid along a little bit with me. And I remember falling into space. And that's all that I remember until I come out of the hole.

Q. Well, do you know how long you were down in this hole?

A. No, sir."

The court held a conference at defendants' request, outside the presence of the jury, and the record discloses the following:

"THE COURT: Well, I heard the testimony this morning and the man said he had refreshed his recollection since giving the deposition and that from reading the doctor's record from the hospital he remembered then what he had told them about tripping over the ladder.

I think that was all fully covered by the direct testimony and this, therefore, would not be impeachment. He said he didn't remember that, but he does now. I heard this outside the presence of the jury and I so ruled a few moments ago.

This offer, of course, is now in, but I still don't think it's impeachment, under the circumstances."

A basic rule of impeachment prohibits allusion to a statement which may differ from testimony in open court where a party admits that his opinion has been altered by some circumstance. At that juncture, no further inquiry can be made. *Logue v. Williams,* 250 N.E.2d 159, 163 111 Ill.App.2d 327.

This rule is not varied because plaintiff's counsel elicited this information during plaintiff's direct testimony. On the contrary, an attorney is to be commended for initiating a correction of testimony without having to be prompted by the court or opposing counsel. There was no error in sustaining plaintiff's objection to defendants' attempted quote from the deposition to show that the plaintiff had, at another time, a confused or varied opinion of the exact minute of his fall.

The majority justified the attempted impeachment because, it is contended, the presence of this ladder was a "central and most important aspect of plaintiff's case." However, that is totally inconsistent with the majority's initial concession that defendants are liable (whether there was or was not a ladder protruding) because of the violation of section 66 of the Illinois Structural Work Act in leaving an unprotected, unbarricaded and unguarded hole.

Therefore, although the ladder may be "another" device mentioned in the Structural Work Act whether plaintiff struck a ladder before he fell would be no basis for reversal, since O'Neil had already violated the act by failing to provide barricades. The additional violation would only be cumulative; it would not constitute reversible error.

In the last analysis, the admission or exclusion of a statement alleged to be inconsistent is generally within the discretion of the trial judge. Unless there is a clear abuse of discretion, such exclusion constitutes no basis for error. (*Nowicki v. Union Starch and Refining Co.*, 1 Ill.App.3d 92, 272 N.E.2d 674; *Closterides v. Dalton*, 49 Ill.App.2d 286, 200 N.E.2d 29.) The trial judge had many years of experience trying these cases and was well versed in the law of evidence. He was correct in his ruling.

I have carefully examined the arguments of counsel and it is clear that all attorneys zealously protected the interests of their respective clients, but I see nothing that is not encompassed in *Enloe v. Kirkwood*, 120 Ill.App.2d 117, 256 N.E.2d 459. The character and scope of argument to the jury is left largely to the trial court, and every reasonable presumption must be indulged that the trial court has performed its duty and properly exercised the discretion vested in it. *Belfield v. Coop*, 8 Ill. 2d 293, 134 N.E.2d 249.

In my opinion, the judgment of the Circuit Court of Cook County should be affirmed.

ADDENDUM TO DISSENT (filed May 15, 1973):

Since filing my dissenting opinion, I have received a special concurring opinion from Mr. Justice Egan. Before writing my dissent I was given to understand that Mr. Justice Egan concurred with Mr. Justice Goldberg in his opinion, thereby constituting the majority opinion. I think Mr. Justice Egan's special concurring opinion at this late date is highly improper, constitutes an attempt to reply or argue against the dissent, and also takes issue with the opinion of Mr. Justice Goldberg on a very vital issue—namely, whether or not this case is within the Structural Work Act. I deem it necessary to clarify this issue in order to have a majority opinion, and I concur with Mr. Justice Goldberg that this case is within the Structural Work Act and was properly tried as such.

The next vital question is what constitutes a majority opinion, and as I see it, we now have three separate opinions. Mr. Justice Goldberg is for reversing and remanding for a new trial; Mr. Justice Egan is for reversing outright; and I am for affirming. I think the only sensible solution to obtaining a majority ruling is for me to say, inasmuch as two justices are for reversal, that if this case is to be reversed I would have to vote for remandment in order to break the tie.

Furthermore, I do not want to be forced into a position of having to file a separate dissent to Mr. Justice Egan's special concurring opinion, even though I completely disagree with what he says. I think he is in error and has misconstrued the facts and the law.

ADDENDUM TO SPECIALLY CONCURRING OPINION (filed May 16, 1973):

In view of the tenor of the addendum to his dissent filed by Mr. Justice Adesko and since it may create the erroneous impression that he was not aware of my complete views or that he had never seen my opinion before the filing, I regretfully conclude that I have no other choice but to answer it.

First, it is not unheard of that a concurring opinion may express disagreement with a dissent. See, for example, the concurring opinion of Mr. Justice Harlan in *Dutton v. Evans,* 400 U.S. 74, at 94-95.

Second, Mr. Justice Adesko received my opinion over a month before filing. He conferred with Mr. Justice Goldberg concerning it but not with me. Neither he nor anyone else conveyed his feelings to me that my opinion was "highly improper." Mr. Justice Goldberg had previously seen my opinion and did confer with me. I invited any observations and criticisms he cared to make.

Third, at the conference following the oral argument each of us took precisely the same position that is reflected in the written opinion. It was apparent then, and it is now, that, since Mr. Justice Goldberg's views on the two separate aspects of the case had one other judge agreeing to each of them, his was the majority view. If Mr. Justice Adesko had any doubts concerning my views after the conference, they certainly should have been dispelled when he received my opinion well over a month before filing and discussed it with Mr. Justice Goldberg. I am at a loss, therefore, to understand how he was "given to understand" that I was in complete agreement with the opinion of Mr. Justice Goldberg.

Mr. JUSTICE GOLDBERG CONCURS WITH ADDENDUM.