EMMA LEE CHAPMAN, Plaintiff-Appellant, Cross-Appellee, and Appellant, *v.* CHECKER TAXI CO., INC., Defendant-Appellee.—(THE CITY OF CHICAGO, Defendant-Appellee, Cross-Appellant.)—ROBBIE MOORE, Plaintiff-Appellee, *v.* THE CITY OF CHICAGO, Defendant-Appellant.— CHECKER TAXI CO., INC., Plaintiff and Counterdefendant-Appellee, *v.* THE CITY OF CHICAGO, Defendant and Counterplaintiff-Appellant.—THE CITY OF CHICAGO, Counterplaintiff-Appellee, *v.* CONSOLIDATED CONSTRUCTION CO., Counterdefendant-Appellant.

First District (4th Division)    No. 58469

Opinion filed October 27, 1976.—Rehearing denied November 24, 1976.

Philip H. Corboy and Sidney Z. Karasik, both of Chicago, for appellant Emma Lee Chapman.

Baker & McKenzie, of Chicago, for appellant Consolidated Construction Company.

Sweeney & Riman, Jesmer & Harris, and Jacobs, Williams & Montgomery, all of Chicago, for appellees Robbie Moore and Checker Taxi Co., Inc.

Richard L. Curry, Corporation Counsel, of Chicago (Daniel Pascale, Assistant Corporation Counsel, of counsel), for the City of Chicago.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

The appeals in this case are taken from judgments entered following a jury trial in the Circuit Court of Cook County resulting from an accident in which a Checker taxi collided with a police car after striking a lane divider. The driver of the taxi, Robert Moore, and his fare-paying passenger, Michael Chapman, were killed, and the driver of the police car, Officer Ira Blackwood, was severely injured.

Several lawsuits were thereafter filed and the actions were consolidated for a jury trial. In the principal actions the plaintiff, Emma Lee Chapman, brought a wrongful death action against the Checker Taxi Co., Inc. (Checker), Consolidated Construction Co. (Consolidated), and the City of Chicago (City), as well as other defendants. The plaintiff, Robbie Moore, the administrator of Robert Moore's estate, brought a wrongful death action against Consolidated and the City, as well as other defendants. Checker brought an action against the City to recover damages for loss of their vehicle and Moore's services and to recover workmen's compensation benefits paid to Moore's family.

Among other actions filed, Checker brought a third-party action for indemnity against the City, and the City filed a counterclaim for indemnity against Consolidated.

The jury returned verdicts in favor of the plaintiff, Emma Lee

Chapman, and against the City and Consolidated, but not Checker, in the amount of $300,000. The jury also returned a verdict of $60,000 in favor of the plaintiff, Robbie Moore, and against the City and Consolidated and returned a verdict of $3,500 in favor of Checker and against the City. The City's countercomplaint against Checker was dismissed. Finally, the trial court entered a directed verdict that Consolidated assume all liability of the City based upon an express indemnification agreement. Other judgments which involve several other actions were entered but are not at issue and will be mentioned only as necessary for consideration of the present appeals. Various appeals which raise numerous issues have been taken from the judgments indicated, but because the issues are both numerous and complex, we shall not list them at this point. We consider them separately hereinafter.

On April 3, 1968, a multiple car collision occurred on north Lake Shore Drive in Chicago. Lake Shore Drive is an eight-lane roadway. Normally four lanes are utilized by northbound traffic and the remainder for southbound vehicles. A permanent concrete divider separates the four southbound from the northbound lanes. This divider begins at Fullerton Avenue and the record suggests it ends at the northern terminus of the roadway. During heavy periods of commuter traffic two lanes are reversed in traffic flow to accommodate the larger traffic volume in the particular direction. As pertinent to this case, the traffic flow of the two inner lanes normally utilized for southbound vehicles is reversed permitting six lanes to be used for northbound traffic. In the morning an opposite procedure is utilized to provide additional lanes for southbound traffic.

Testimony established the afternoon lane changeover usually began about 3:15 p.m. The City would prevent all southbound traffic from entering at the northern terminus of Lake Shore Drive, by having its workmen erect temporary barricades. Southbound access could apparently be gained by using arterial entryways located further south. These workmen would then proceed southward in a maintenance vehicle with one workman placing rubber cones to separate the two inner lanes usually used for southbound traffic from the two outer lanes. No southbound vehicle is then allowed to enter these inner lanes which are to the east of the cones and are used for northbound traffic.

The employees would eventually reach Fullerton Avenue, which is near the scene of the accident in question. At this juncture there are three sets of moveable dividers or fins, which are hydraulically operated. Each divider is in sections of about 20 feet in length. These dividers extend southward from Fullerton Avenue to the La Salle Street overpass, a distance of 1200 yards. Further south of this point is another permanent divider between the normal north and south lanes. The eastern set of

moveable dividers is exclusively used to separate the normal northbound lanes and is not directly at issue in this case. A set of center dividers, when raised, separates the four regular north and south traffic lanes. The western set of dividers is located between the two inner lanes normally used for southbound traffic. These dividers are in a ground level position when the four southbound lanes handle this direction of traffic flow.

The City workmen would be principally assisted by one additional group of City workers. The latter group would operate a control box near Fullerton which would raise the western dividers. The center dividers would then be lowered to allow northbound vehicles to enter the two inner southbound lanes thus permitting the use of six lanes for northbound traffic during the late afternoon.

Edward Poremba, a City employee who worked on the change of traffic lanes, described the procedure utilized to effect the use of the divider system. He testified he would place several rubber cones on top of a portion of the western set of dividers that were then in a lowered position. After completion of this phase of the activity, he and his partner, who was driving their vehicle, would be about three blocks south of Fullerton. Another City employee at the control box would activate the mechanism and the west divider would be elevated. Poremba and his co-worker would proceed southward for a short distance to make sure the south end of the west divider was raised and would remain there near a curve in the roadway. When this operation was completed, Poremba's co-worker radioed the workmen at Fullerton Avenue. The center divider then would be lowered over a three-minute period of time. Poremba and his co-worker would drive away after they ascertained the south end of the center divider was down. But Poremba could not see if the entire center divider was down from his position, although he indicated they would not leave until the south end of the center divider was lowered. It may be inferred from his testimony, however, that the workers at Fullerton could ascertain if the remainder of the divider was properly functioning.

Poremba testified on the day of the accident he noticed a car hood two blocks behind him in the southbound lanes. This occurred about two or three minutes after the center divider had started to be lowered and after Poremba had left the south end of the divider.

Amico Schullo was the co-worker with Poremba. He corroborated Poremba's testimony concerning the procedure for reversal of traffic lanes and said he would radio the workmen at Fullerton Avenue that the center fins were down before proceeding. Schullo testified at the time of the accident the center fins were being lowered but the south end of the fins was not yet down in the area he could see. While he initially indicated he saw Consolidated employees working on the divider system after the

accident, Poremba admitted on cross-examination he had no independent recollection of this observation.

The accident in question occurred about 3:50 p.m. on April 3, 1968, after if had rained. The location of the accident was between the La Salle Street overpass and Fullerton Avenue; and it is to be gathered from the record the precise site was nearer the latter location. Robert Moore was driving a taxicab owned by Checker and Michael Chapman was his passenger.

Shelly Weisberg was driving in the normal northbound lane second nearest the center divider. He had been using Lake Shore Drive for 17 years. He testified several sections of the center divider by the La Salle Street overpass were raised and prevented entry into the two inner southbound lanes. Beyond this point the center divider was down thereby creating "express lanes" for northbound traffic which had already started to enter to use these lanes. He claimed he was travelling between 40 and 45 miles per hour as were all nearby vehicles, and he was preparing to enter the express lanes. At this point Moore's taxicab was 50 feet ahead and in the lane nearest the center divider system. The taxicab signalled a lane change and then the taxicab's rear wheels went into the air after that portion of the taxicab struck part of the center divider. The taxicab went out of control and proceeded in a westerly direction across the express lanes and struck the raised divider that separated the two lanes of southbound from the six northbound lanes. While he did not see the impact which followed, the record shows Moore's vehicle perpendicularly entered the southbound lanes and was struck by a Chicago Police car driven by Ira Blackwood, which was in the southbound lane near the divider. Another vehicle driven by Diane Mason, in the outer southbound lane, also struck the taxicab.

Weisberg stopped to render assistance. He described the center divider as being down both to the north and south from the point where the Moore vehicle had hit the center divider, where two sections of the center fins formed a "V" with the peak of the triangle less than one foot off the ground. After the accident victims had been removed from the scene, this witness noted the section of the divider which the taxicab struck remained in the same position as it was at the time of the accident. On cross-examination Weisberg admitted he had given a prior statement wherein he said as he prepared to cross the center divider he saw the whole length of the divider, which the Moore vehicle struck, "flapping up and down." However, he testified at trial he did not see the whole center divider come back up. Rather he said he only saw where the taxicab hit the divider and that section appeared to rise under the taxicab.

Roland Paulnitsky, a Chicago Police cadet at the time of the accident, testified he was in the normal northbound lane nearest the center divider.

He could clearly see the center divider was in the process of being lowered. Moore's taxicab, which was about 50 yards in front, moved into that lane. Paulnitsky estimated Moore's speed at 60 miles per hour. The taxicab's left tire hit the peak of the divider and crossed the express lanes which did not as yet have traffic entering them. The taxicab then hit the western divider and caromed into the southbound lanes where it collided with a police car. As Paulnitsky went to render assistance, he noted the center divider was raised three inches and it formed a peak. He said eventually all the center dividers were at ground level after the accident and this observation was corroborated by another police cadet who arrived several minutes after the accident occurred and another witness who viewed the scene about 30 minutes after the accident.

The evidence deposition of Charles Warren Nelson was admitted against all parties except Consolidated because it was not a party in the litigation when his deposition was taken. Consequently, Consolidated had not participated in the matter. In this deposition Nelson testified he was proceeding northbound on Lake Shore Drive. It had just stopped raining and the roadway was wet. He was travelling at 40 miles per hour when a taxicab passed him in the far inner lane. The taxicab remained in front of him at a steady speed until it struck an object and went out of control. The vehicle crossed into the southbound lanes where it was hit by a police car and another vehicle travelling in a southbound direction. Nelson claimed after the accident he saw the center divider which the taxicab had hit. It was at an angle and was lower at the south and higher at the north end beyond the point where the taxicab struck. He did not see the center dividers moving up or down although he had testified in the deposition the southern section of the central divider had been down for several blocks before reaching the raised section. He also said, after witnessing the accident, he left the roadway at the next exit and then reentered to go southbound to the accident site. When he returned to the accident scene several minutes later, the sections of the divider struck by Moore's vehicle were raised at an angle. The sections further south were down. Several sections immediately north of the portion of the dividers hit by the taxicab were raised but then the remainder angled downward. He said the dividers remained in this position during the period he was there.

Substantial evidence was presented concerning the roadway divider. Robert Pancoe, president of Consolidated, testified his company had entered into a contract with the City to rehabilitate the divider system and resurface the area. In regard to the time of completion of Consolidated's work on Lake Shore Drive, Pancoe produced a certified payroll dated January 8, 1967, and he said this formed the basis for his recollection as to the time Consolidated employees worked on the project. But he could not say whether Consolidated worked on the hydraulic system after that date.

Pancoe described the system as being hydraulically operated and divided into six zones. Two lines run from the pump station to the trench of each divider. The 20-foot length sections of the divider were connected by bolted steel plates. One line was a feeder line and the other returned the transmission oil, which was the fluid used. When the system was activated, fluid was forced into the supply line and the pressure caused thereby would raise jacks supporting the divider. These jacks had a spring mechanism that locked while the divider was in a raised position. To lower a divider the hydraulic fluid was sent through the return line causing pressure above the cylinder and resulting in the release of the locking mechanism. Gravity would then lower the divider. Testimony further indicated the divider would remain raised unless the locking mechanism was released. Pancoe testified if an air bubble was in the hydraulic line, the condition might prevent the disengagement of the locking mechanism in a divider section while other sections descended. This could result in creating a peak at a junction between two divider sections. But Pancoe did not recall witnessing any condition similar to this.

Each jack consisted of a metallic body containing a piston, a piston ring and packing. A shaft was at the top of each piston and it protruded from the jack. Consolidated had rehabilitated the jacks by steam cleaning these devices to facilitate disassembling. New piston rings and packing were installed, but any jack which was unfit was replaced. The refurbished jacks were then reinstalled after Consolidated and the City had inspected them. New hydraulic lines were used in the system.

A hydraulic engineering firm had initially conducted the rehabilitation. Apparently Consolidated, however, was dissatisfied with this firm's performance. Its officers, Norman and Robert MacMillin, testified as to the operation of the divider system. Norman MacMillin said hydraulic pressure was crucial in unlocking the jacks to allow their descent. If there was a leak in the packing or friction in the jack cylinder, this could affect the pressure buildup and the rapidity of the jack movement. Depending on the resistance in the cylinder packing or piston rings, one divider section might rise faster than others creating a "saw-toothed" effect in the entire divider.

Theodore Virgilio, Consolidated's foreman in charge of installing the rehabilitated system, testified as to a leakage problem in the divider jacks. Virgilio indicated Consolidated would repair the difficulty; although he did not remember any repair in 1968. This witness indicated complaints had been made that the packing in the jacks was not properly installed. The jacks would then leak oil and not work properly. He also said the hydraulic lines would be "bled" to remove air in order to have the divider system work. A jack leaking oil would also be "bled."

George Eng, the City's resident engineer, administered the rehabilitation contract until it was terminated. The City made final payment for the entire project in September 1970, although the hydraulic system was accepted in early 1969. Eng explained a problem existed in frequent leakage of the jacks which occurred, in part, during 1968; and he referred complaints to the Bureau of Traffic. He testified this problem existed until final acceptance of the system. When the jacks leaked, that particular portion of the divider did not operate properly, and it would not go up or down. If air entered the system, this too would affect the system's operation. Eng stated "peaking" conditions could normally occur.

Several City interdepartmental memoranda were introduced indicating malfunctions in the divider system had occurred in early 1967. Another letter, dated March 12, 1968, emanating from a City agency, expressed dissatisfaction with the operation of the divider system. On cross-examination by Consolidated, Eng admitted a letter had been sent to Consolidated in January 1968, informing it of work that had not yet been completed. There was no mention of difficulty with the hydraulic mechanism. Eng said, however, the list contained therein was not exclusive and oral criticism also would be given.

Consolidated argues that error occurred in the refusal of the trial judge to grant its motion for a directed verdict as to liability in the Moore wrongful death action because Robert Moore, the Checker taxicab driver, was contributorily negligent. Consolidated's argument relates to the contention advanced by Chapman that Moore was negligent and the jury's verdict absolving Checker of liability for Chapman's death was improper. The City adopts the views of Consolidated and Chapman in this matter because the City seeks reversal of the $3,500 judgment entered against it for the workmen's compensation benefits paid to Moore's family by Checker and property damage to the latter's vehicle. Should Moore's misconduct be established, the City seeks recovery pursuant to its countercomplaint against checker for property damage to the police vehicle driven by Ira Blackwood.

Basically, consolidated and Chapman claim Robert Moore's driving violated certain statutory provisions regarding the speed of the vehicle and lane changeover procedure (Ill. Rev. Stat. 1967, ch. 95½, pars. 146, 156(d) and 157) and that he disregarded a "keep right" sign at the southern end of the divider system. Consolidated concedes, however, that violation of these statutes would not in itself preclude recovery.

■■ The record irrefutedly establishes the portion of the divider, which was hit by Moore's vehicle, was raised less than one foot above ground level only at the point of impact. Weisberg's testimony indicated vehicles were already entering the express lanes prior to the accident and

the testimony of Diane Mason corroborated his recollection. This factor tends to lessen the import of the warning sign upon which Consolidated and Chapman rely. Additionally, we note that Weisberg's testimony as to the speed of the Moore vehicle indicates that it was not travelling at an excessive rate of speed. While Paulnitsky's testimony disputed this fact, resolution of this matter was a question of credibility to be resolved by the jury. (*Douglas v. Chicago Transit Authority* (1972), 3 Ill. App. 3d 318, 279 N.E.2d 44.) The determination of contributory negligence is usually a question to be determined by the jury (*Ellis v. Howard* (1972), 4 Ill. App. 3d 852, 281 N.E.2d 793.) Only where an injured person's conduct is such that all reasonable individuals would conclude he was injured as a result of his own negligence does the question of contributory negligence become a matter of law. (*Lewis v. Hull House Association* (1975), 25 Ill. App. 3d 617, 323 N.E.2d 600.) It is possible the jury considered that Moore may not have been able to see the raised "peak." As heretofore noted, the question of the taxicab's speed at the time of impact was disputed and the jury could have decided Moore was not exceeding the speed limit. But, assuming his speed was in excess of the limit, this factor might not necessarily have affected the accident because it would have occurred even absent Moore's conduct in this regard. (*Ferdinand v. Yellow Cab Co.* (1976), 42 Ill. App. 3d 279, 355 N.E.2d 547.) Under the standard enunciated in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, we cannot say the evidence of Moore's conduct viewed in the most favorable aspect to him so overwhelmingly favors Consolidated and the City that as a matter of law Moore was contributorily negligent. The trial court did not err in failing to grant a directed verdict against plaintiff in the Moore action.

■■ Similarly, in the Chapman case it is maintained the jury's verdict exonerating Checker for his death is against the manifest weight of the evidence. "A verdict is against the manifest weight of the evidence when an opposite conclusion is clearly apparent, or the finding of the jury appears to be unreasonably arbitrary and not based on the evidence." (*Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 158, 349 N.E.2d 578.) The mere occurrence of an accident does not permit the presumption that a carrier was negligent. (*Kirkwood v. Checker Taxi Co.* (1973), 12 Ill. App. 3d 129, 298 N.E.2d 233.) There would appear to be sufficient evidence which, if believed, would permit a jury to properly conclude that the standard of care Checker owed to Chapman was not breached. But, if Moore did drive improperly, it was for the jury to decide whether such conduct was causally related to the accident. (*Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 117 N.E.2d 74; *Watson v. Chicago Transit Authority* (1973), 12 Ill. App. 3d 684, 299 N.E.2d 58; *Gauchas v. Chicago Transit Authority* (1965), 57 Ill. App. 2d 396, 206 N.E.2d 752.)

The jury's verdict and judgment entered thereon exonerating Checker of liability to Chapman cannot be said to be clearly unreasonable or not based upon the evidence. See *Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.2d 624.

Consolidated maintains error was committed when the trial judge did not direct verdicts against Chapman and Moore because it claims there was an insufficient evidentiary basis to support the wrongful death verdicts. Citing *Rotche v. Buick* (1934), 358 Ill. 507, 193 N.E. 529, for the proposition that the mere occurrence of an accident does not demonstrate negligence as a cause thereof, Consolidated concludes there was no proof of malfunctioning caused by its negligence. It further says the dividers operated as they were designed and the question of design was not an issue at trial. Two bases for this contention may be quickly resolved. Consolidated relies on the testimony of Anico Schullo that the center divider did not malfunction on the date of the accident. His testimony may be discounted because the record suggests he may not have been able to view the area where the accident occurred from his position at the southern end of the divider system. Similarly, Consolidated relies on George Eng's testimony that he also did not know of any malfunctioning that day. However, he said as complaints about the divider system became numerous, they were referred directly to another City agency which contacted Consolidated to repair the difficulty. Thus, his lack of actual knowledge concerning the malfunction complaint on that day would not seem convincing enough to make a determination.

Consolidated also argues it was not negligent because the center divider eventually was completely lowered after the accident. It suggests the "peaking" condition was a normal design feature and was not evidence of Consolidated's negligence. The record establishes the hydraulic jacks were to be rehabilitated by Consolidated, yet oil leakage in the jacks did occur. At the time of the accident, only the "peak" which was struck by Moore's vehicle was in a raised position. Consolidated's president indicated, however, that "peaking" could occur if air was in the hydraulic system. If such condition existed, clearly Consolidated would be responsible. Moreover, Consolidated's foreman testified a jack would not function properly if oil leakage occurred because of inadequate packing. He also indicated each jack would have to be "bled" when this deficiency, which was Consolidated's responsibility, would be corrected. We believe this evidence supports the conclusion that "peaking" at the point of impact of the Moore vehicle could be caused by other than the normal design of the system urged by Consolidated. Our view is supported by Weisberg's testimony he observed the entire divider system completely lowered after the accident except for the portion in question, which would seem dissimilar to the normal "saw-toothed" effect

described by Norman MacMillin. Based upon the record, we cannot say the trial judge erred in not directing a verdict as to Consolidated's liability.

■■ Consolidated says, even if it was negligent, its misconduct was not the proximate cause of the accident but merely a passive condition allowing the negligence of Robert Moore or the City to cause the accident. We have previously discussed the former's conduct and need not reiterate our views in that regard. Assuming, *arguendo*, only for purposes of this contention that another factor existed which could be classified as a proximate cause of the accident, there may be more than one proximate cause of an accident; and the determination of this question is to be made by the trier of fact. (*Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9.) We are of the opinion the factual context of this case plainly shows the accident was a probable and foreseeable result of Consolidated's negligence and thus a proximate cause thereof. (*Gelsumino v. E.W. Bliss Co.* (1973), 10 Ill. App. 3d 604, 295 N.E.2d 110; *Fugate v. Sears Roebuck & Co.* (1973), 12 Ill. App. 3d 656, 299 N.E.2d 108.) The jury's verdict has sufficient evidentiary support in this regard.

At this juncture we deem it appropriate to consider the cross-appeal filed by Chapman contesting the sufficiency of the $300,000 awarded as damages. She commenced the wrongful death action as the administrator of her deceased husband's estate. She has enumerated various factors to be considered in awarding damages and their relationship to the extensive evidence presented thereon to support her conclusion that the verdict was contrary to the manifest weight of the evidence. She further maintains a diminution of damages was affected by improper and prejudicial argument advanced by counsel for Checker and Moore. Specifically, in this regard she claims Checker's counsel in closing argument, and contrary to the trial court's directive, commented upon the uncertainties of life in closing argument stating "Mrs. Chapman is now Mrs. Johnson, Sr." She also predicates her claim on the comment of Moore's counsel that recovery in a wrongful death action is limited to economic loss. Finally, error is urged in the argument of Checker's counsel that an award could draw a specified interest rate in a lending institution because this statement was not supported by the evidence.

A comment indicating the remarriage of Chapman's widow would be clearly improper. (*Watson v. Fischbach* (1973), 54 Ill. 2d 498, 503, 301 N.E.2d 303.) But during further argument to the jury, Chapman's counsel indicated that Mrs. Johnson was the mother of the deceased, not his widow, and that such matter had no bearing on the case. Counsel's comments acted to cure any misapprehension created by the observation of Checker's counsel in closing argument.

■■ The record shows extensive evidence and argument were introduced regarding damages. No claim is made that the jury was not properly instructed and the instruction given on this damage issue was detailed. We have recently said in related circumstances:

"It is generally recognized that the assessment of damages in a personal injury case is the preeminent function of the jury and such award will not be overturned on review unless the jury is not correctly instructed as to the elements measuring damages and the size of the verdict is the result of either passion or prejudice of the jury having overlooked an element of damages. (*E.g., Huston v. Chicago Transit Authority,* 35 Ill. App. 3d 428, 434, 342 N.E.2d 190, 195-96; *Ward v. Chicago Transit Authority,* 52 Ill. App. 2d 172, 176, 201 N.E.2 750, 752.) Moreover, in determining on appeal whether a disputed verdict is the result of passion or prejudice or a clear oversight by the jury, * * * consideration should be given to (1) all the testimony surrounding the claimed items of damage (*Altman v. Gregg,* 11 Ill. App. 3d 751, 298 N.E.2d 288 (abstract opinion) as well as (2) whether the trial judge, who saw and heard all that took place at trial, approved the verdict. *E.g., Orlandi v. Caraway,* 9 Ill. App. 3d 628, 632, 293 N.E.2d 337, 339; *Ward v. Chicago Transit Authority,* 52 Ill. App. 2d at 172, 176, 201 N.E.2d 750, 752; compare *House v. Stocker,* 34 Ill. App. 3d 740, 751, 340 N.E.2d 563, 571." *Costello v. Chicago Transit Authority* (1976), 40 Ill. App. 3d 461, 471-72, 352 N.E.2d 417.

Moreover, an able and experienced trial judge did not find the verdict to be improper. We cannot say the amount awarded to Chapman is so disproportionate to the evidence and instructions pertaining thereto or that the issue of damages was influenced by passion or prejudice. See *Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 158, 349 N.E.2d 578; *Wells v. Web Machinery Co.* (1974), 20 Ill. App. 3d 545, 315 N.E.2d 301.

Both Chapman and Consolidated assert their respective motions for severances should have been granted. It is claimed the wrongful death actions of Chapman and Moore should have been severed because the effect of a joint trial "was to pit the plaintiffs against one another and hence reduce the size of the verdicts." Further, Chapman says Moore and Checker were able to join in absolving the latter of liability. Extended consideration need not be given to these contentions. We have previously held the amount of Chapman's damages and the jury's verdict absolving Checker of liability in the Chapman wrongful death action were not improper.

Consolidated's general request for a severance was made after several witnesses had testified and immediately prior to introduction of the

evidence deposition of Charles Warren Nelson. A limiting instruction given to the jury at the time specifically excluded application of the evidence deposition to Consolidated, and a general instruction regarding the use of evidence so limited was given at the close of trial. (IPI— Civil No. 1.01[7].) Consolidated also reiterated this limitation during its closing argument. This would tend to negate a claim of prejudice. Consolidated obviously knew of the existence of the deposition which was taken and filed in the circuit court in April 1970, contemporaneously with the amended complaints of Chapman and Moore, which named Consolidated as a co-defendant in those wrongful death actions. Trial in this matter commenced in September 1971; yet Consolidated does not contend it sought an additional evidentiary deposition or other discovery upon Nelson.

● 5   The determination to grant a severance is within the sound discretion of the trial court and is dependent upon the facts of each case. (*People v. Perry* (1975), 27 Ill. App. 3d 565, 327 N.E.2d 259; *Martin v. McCarry* (1971), 2 Ill. App. 3d 650, 275 N.E.2d 897.) The question to be considered is whether substantial prejudice occurs if a severance would not be granted. (*Martin v. McCarry* (1971), 2 Ill. App. 3d 650, 275 N.E.2d 897.) It is uncontroverted these actions arose from a common factual situation which relied in great part upon the presentation of the same witnesses and physical evidence. This would favor consolidation of the actions. Moreover, the significant matters contained in the Nelson deposition were cumulative of the testimony of Shelly Weisberg. Under the circumstances of this case and specifically in view of the fact the jury was fully advised of this limitation, we conclude the trial judge did not abuse his discretion in refusing Consolidated's motion for a severance, nor was Consolidated prejudiced thereby.

Consolidated claims the trial judge should not have directed a verdict in favor of the City on the issue of Consolidated's obligation to indemnify. The contract in pertinent part read:

> "The Contractor [Consolidated] shall indemnify * * * the City * * * against all suits or claims that may be based on any injury to persons or property that may occur * * * in the course of the performance of this contract by the Contractor, whether or not it shall be claimed that the injury was caused through a negligent act or omission of the Contractor * * * or the City * * *.
>
> "Now, [the] Contractor shall * * * indemnify * * * the City of Chicago against all loss in consequence of the granting of said contract, or which may in anywise result therefrom * * *."

Consolidated recognizes the broad import of the indemnity provision. But it says the act, which gives rise to the duty to indemnify, must relate to the performance or consequence of the contract. Consolidated

conjectures the jury could have determined that Consolidated's contract performance was complete at the time of the accident or the collateral acts of the City alone in the operation of the divider system, and traffic control procedures, which were not connected with the roadway rehabilitation, gave rise to separate liability against the City.

The evidence introduced relating to the completion of the contract establishes the correctness of the trial judge's action in directing a verdict on this basis. As hereinafter discussed, the propriety of the testimony of George Eng is disputed by Consolidated; but such testimony clearly indicated the work on the hydraulic system was not finally accepted until 1969. He also said the difficulty with the jacks occurred in 1968 which would show that Consolidated repaired the difficulty. Robert Pancoe, Consolidated's president, and its foreman, Theodore Virgilio, were vague in their testimony concerning work completion. While Pancoe indicated a certified payroll would show the date Consolidated's employees ceased work on the project, he was able to produce this record only for the period of January 1967; and he had no recollection concerning any work thereafter. However, the Consolidated exhibit introduced in the cross-examination of George Eng indicates certain work remained to be done on the roadway project after January 1968. This strongly suggests that Consolidated employees were still working after that time and negates the import of the certified payroll record.

■■ Consolidated's position regarding the jury's finding the accident may have occurred only as a result of the City's operation of the divider system is without merit. It is presumed a jury will follow the court's instructions. (*Ferman v. Estwing Manufacturing Co.* (1975), 31 Ill. App. 3d 229, 334 N.E.2d 171.) The instructions given to the jury concerning the Chapman action do not refer to any basis for liability other than the renovations of the hydraulic jacks. The jury's verdict against Consolidated and the City in the Chapman action would thereby tend to negate the import of Consolidated's position. (See *Tenenbaum v. City of Chicago* (1973), 11 Ill. App. 3d 987, 297 N.E.2d 716, *aff'd in part, rev'd in part on other grounds*, 60 Ill. 2d 363, 325 N.E.2d 607.) Moreover, after consideration of the record we conclude the evidence presented was sufficient to sustain the trial judge's action.

Consolidated further urges reversible error occurred when the trial judge refused to give a special interrogatory which queried whether the jury found the City was liable "as a result of the construction performed by Consolidated." The claim of error is predicated upon the supposition that the jury could have determined the City's liability arose from circumstances unrelated to Consolidated during the former's operation of traffic control. In its reply brief Consolidated has stated "even though the trial court directed a verdict on this issue [Consolidated's obligation to

indemnify] the jury still had to consider whether the City was liable to Chapman and Moore. While the interrogatory would not have tested the jury's verdict, it would have questioned the verdict for which the trial court entered a directed finding."

The trial judge must give a special interrogatory which is properly formulated and submitted on an ultimate question of fact. (*Estate of Constas v. Constas* (1976), 42 Ill. App. 3d 223, 355 N.E.2d 683.) The purpose of the special interrogatory is to provide verification of the general verdict in relation to questions of ultimate fact. (*Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 222 N.E.2d 468.) It is designed to check the jury's deliberations (*Beverly Bank v. Penn Central Co.* (1974), 21 Ill. App. 3d 77, 315 N.E.2d 110); and an answer to a special interrogatory should control over a general verdict (*Maram v. Otis Elevator Co.* (1973), 16 Ill. App. 3d 753, 306 N.E.2d 497 (abstract opinion)).

■■ Consolidated's argument merely focuses on another attempt to question the propriety of the directed verdict on indemnity and it has cited no authority to suggest the procedural propriety of its request. To have granted such request would have seemed logically inconsistent after the trial judge had directed a verdict on the isse of indemnity. Moreover, were we to consider that the jury could have rendered a negative response to said interrogatory, this would not necessarily be a basis to question the correctness of Consolidated's obligation to indemnify. The indemnification contract is extensive in consideration of factors giving rise to such obligation. The record shows Consolidated was adjudged liable for defective renovation of the hydraulic jack system. Even assuming the City liability was based on its actions collateral to the construction, Consolidated's breach of duty was still a proximate cause of the accident and under the express terms of the agreement Consolidated had an obligation to indemnify. Thus a negative answer to the interrogatory would not have controlled the general verdict and the trial judge properly rejected its submission.

Consolidated complains of various evidentiary matters which it says resulted in the deprivation of a fair trial. Consolidated initially contends that Checker's counsel implied Consolidated was negligent because it used transmission oil in the divider system. George Eng, however, stated use of this fluid was proper and suited for colder weather conditions. This would seem to obviate a claim of prejudice.

Consolidated questions the relevancy of certain City documents compiled before the accident which pertain to the rehabilitation project. It asserts these items do not establish a defect in the hydraulic system when the accident occurred. These documents were relevant and could be used to determine the question of foreseeability. (*Cf. Ray v. Cock*

*Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9.) Moreover, these documents might be described as business records and Consolidated does not dispute this classification. (Ill. Rev. Stat. 1971, ch. 110A, par. 236.) They are relevant and logically connected to the matters presented in this case and tend to indicate what may have occurred. (See *Klavine v. Hair* (1975), 29 Ill. App. 3d 483, 331 N.E.2d 355; *Brown v. Nale* (1969), 106 Ill. App. 2d 238, 245 N.E.2d 9.) No error was caused when they were admitted into evidence.

Consolidated suggests reversible error occurred when the project contract was allowed to be viewed by the jury during its deliberations and the contract referred to insurance matters which were highly prejudicial. The record shows that during trial the contract was introduced during the testimony of. Robert Pancoe. No mention was made of the insurance provisions nor does Consolidated maintain the jury read the contract at this time. After the jury had been instructed, and outside its presence, the trial judge indicated the contract would be provided for the jury's inspection. Consolidated's trial counsel objected because of the insurance provisions contained therein. The trial judge agreed and indicated the page containing the provisions should be removed. There is no subsequent mention of the matter contained in the report of proceedings which would suggest the trial judge's solution or a variation thereof was not utilized. Under these circumstances we deem Consolidated's argument to be unsupportable.

Consolidated further advances a claim of error regarding the purported impeachment of Roland Paulnitsky by the introduction of his police report captioned "Aiding at an Accident." This report did not mention any facts concerning the actual accident to which he later testified. It merely described his assistance and did not require any facts detailing the accident. Review of the record shows the trial judge specifically instructed the jury to consider this report only as it pertained to the action filed by Ira Blackwood against Checker which resulted in the jury's verdict in favor of Checker. Also, Consolidated's post-trial motions fail to make reference to this allegation of error. There is no reason to afford Consolidated a new trial on this basis.

Consolidated avers error occurred when certain photographs and testimony regarding several of these pictures were presented to the jury. The group of photographs was taken several months after the accident and was introduced on behalf of Moore. Consolidated says photographs which illustrate the area are not improper but these photographs are not characteristic. Consolidated asserts several of the pictures were taken during a lane change and depict the dividers in the "peaked" condition. Thus, it says the pictures imply the same condition existed at the time of the accident. This matter was presented to the trial judge in post-trial

motions but Consolidated's claim was denied. The record does not contain these photographs and any claim the trial judge committed reversible error cannot be properly evaluated. *National Steel & Copper Plate Co. v. Angel Research, Inc.* (1963), 39 Ill. App. 2d 419, 188 N.E.2d 500.

It is urged by Consolidated reversible error was committed in Checker's introduction of testimony concerning damage to its vehicle. Two witnesses testified concerning photographs which, in part, depicted the undercarriage of the taxicab and showed certain damage. These matters were admitted subject to establishment of a proper foundation. However, the witnesses were precluded from testifying as reconstruction experts. After the taxicab had been viewed by the jury, the trial judge ordered this testimony and the photographs stricken, and the jury was specifically instructed to disregard these matters. Consolidated says these precautions could not cure the prejudice inuring to Consolidated for this improper evidence suggested the dividers had risen under the taxicab rather than the vehicle merely striking the obstruction.

The record shows apparent agreement with the trial judge's action during the proceedings. Moreover, the instruction given to the jury pertaining to the testimony and exhibits would obviate any claim of prejudice (*Danile v. Oak Park Arms Hotel, Inc.* (1964), 55 Ill. App. 2d 2, 203 N.E.2d 706); and Shelly Weisberg's testimony indicated the divider appeared to rise under the taxicab, which would further tend to lessen the import of the stricken evidence.

Consolidated further argues George Eng's testimony regarding operation of hydraulic systems and his interpretation of the contract provisions was improper. Much of Eng's testimony pertaining to the operation of the hydraulic system was repetitive of that supplied by witnesses whose expertise is not questioned by Consolidated. Thus, we do not believe further exposition of this claim is needed.

■■ Consolidated's objection to Eng's testimony regarding the interpretation of the contract focuses on his opinion as to the final acceptance of the contract, the manner in which work was to be performed and responsibility for its performance. This objection is not well founded. This witness was the engineer whose duty was to supervise contract performance and in this capacity he was in contact with Consolidated. He was therefore in a proper position to testify about the contract performance. While the contract is not contained in the record, it was no doubt complex and subject to interpretation. In seeking to ascertain the intent of the parties thereto, a court may look to the interpretation which the parties have placed upon it by their acts during its performance. (*Occidental Chemical Co. v. Agri Profit Systems, Inc.* (1975), 37 Ill. App. 3d 599, 346 N.E.2d 482; *New York Central*

*Development Corp. v. Byczynski* (1968), 95 Ill. App. 2d 474, 238 N.E.2d 414.) We do not find the trial judge erred in permitting Eng's testimony in this regard.

The City maintains a verdict should have been directed against plaintiffs in the Chapman and Moore cases concerning its liability to them. It also urges reversal of the judgment entered in favor of Checker for $3,500. The basis for the City challenge to the judgment in the Moore action is the assertion that Moore was contributorily negligent and this conduct was the only proximate cause of the accident. We have previously considered these assertions and have found there was no basis to disturb the jury's determinations thereon. The jury instructions relative to the Chapman case predicated liability of Consolidated and the City on the installation, repair, and renovation of the hydraulic jacks used in the divider system. The evidence showed that the City's conduct was not entirely disassociated from Consolidated in the roadway renovation. Testimony indicated the rehabilitated jacks were inspected by the City before installation in the divider system, and the entire construction project was subject to the approval of the City. There is sufficient evidentiary support for sustaining the jury's determination of liability to Moore and Chapman in the respective wrongful death actions. Further, imposition of liability against the City for damage to Checker's taxicab and statutory benefits it paid to Moore's widow was proper.

Finally, in Consolidated's brief it has contested the propriety of several jury instructions. No record of jury instruction conference has been submitted on appeal. During oral argument of this cause counsel for Consolidated had agreed to withdraw consideration of this issue from the appeal, and we need not therefore address this matter.

We have examined the varied issues presented by the parties in these appeals and discern no basis to disturb the judgments entered. This was a long and difficult trial of complex issues, expertly handled by a very able judge of extensive experience. We find no reversible error. Accordingly, the judgments of the circuit court are affirmed.

Judgments affirmed.

JOHNSON, P. J., and BURMAN, J., concur.